## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **CHAPTER 11** |
| | : | |
| **PROFESSIONAL VIDEO** | : | |
| **ASSOCIATION, INC.** | : | **NO. 95-016 PJW** |
| | : | |
| **DEBTOR** | : | |
| | : | |
| **MICHAEL J. HORAN** | : | **Adversary Proceeding No. A98-247** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WILLIAM DANTON,** | : | |
| **PROFESSIONAL VIDEO** | : | |
| **ASSOCIATION, INC., and VIDEO** | : | |
| **LOTTERY CONSULTANTS, INC.,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

### NOTICE OF APPEAL

Michael J. Horan, the plaintiff appeals under 28 U.S.C. § 158(a) or (b) from the judgment, order, or decree of the bankruptcy judge dismissing Plaintiff's adversary proceeding, entered in the above captioned adversary proceeding on the 24th day of August, 2007 and September 14, 2007.

The names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

Louis M. Tarasi, Jr., Esquire – C. William Kenny, Esquire
Tarasi & Tarasi, P.C.
510 Third Avenue
Pittsburgh, PA 15219
412-391-7135
Attorney for Plaintiff-Appellant
Michael J. Horan

Steven E. Angstreich, Esquire
Levy Angstreich, Finney, Baldante,
Rubenstein & Coren, P.C.
1616 Walnut Street, 18th Floor
Philadelphia, PA 19106
215-735-1616
Attorney for Defendant-Appellee
William Danton, and Video Lottery, Inc.

Elwyn Evans, Jr., Esquire
1502 N. French Street
P.O. Box 1037
Wilmington, Delaware, 19899
302-656-5999
Local Council for Michael J. Horan


Dated: _9/24/2007_                    Signed: _Louis M. Tarasi Jr_
                                             Louis M. Tarasi, Jr.,

                                             TARASI & TARASI, P.C.
                                             510 Third Avenue
                                             Pittsburgh, PA 15219
                                             412-391-7135

## PROOF OF SERVICE

I, Louis M. Tarasi, Jr., Esquire, do hereby certify that two copies of the foregoing

Notice of Appeal was served by first class mail, postage pre-paid, on this 24th of

September, 2007 upon the following;

Honorable Brendan L. Shannon
824 North Market Street
6th Floor
Wilmington DE, 19801

Steven E. Angstreich, Esquire
Levy Angstreich, Finney, Baldante,
Rubenstein & Coren, P.C.
1616 Walnut Street, 18th Floor
Philadelphia, PA 19106
215-735-1616

Elwyn Evans, Jr., Esquire
1502 N. French Street
P.O. Box 1037
Wilmington, Delaware, 19899

By: _____
    Louis M. Tarasi, Jr.
    Counsel for Plaintiff Horan
    TARASI & TARASI, P.C.
    510 Third Avenue
    Pittsburgh, PA 15219
    412-391-7135

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | )<br>) Case No. 95-016 (BLS)<br>) |
| PROFESSIONAL VIDEO<br>ASSOCIATES, INC. | )<br>) Chapter 11<br>) |
| Debtor. | ) Jointly Administered<br>) |
| —————————————————— | )<br>) |
| MICHAEL J. HORAN, | )<br>) |
| Plaintiff, | ) Adv. Proc. No. 98-247<br>) |
| v. | )<br>) |
| WILLIAM DANTON, PROFESSIONAL<br>VIDEO ASSOCIATION, INC., AND<br>VIDEO LOTTERY CONSULTANTS,<br>INC., | ) **Related to Docket Nos. 177**<br>) **178 & 179**<br>)<br>) |
| Defendants. | )<br>) |
| —————————————————— | ) |

## ORDER

AND NOW, this **24th** day of **AUGUST, 2007**, upon consideration of the Memorandum of Law filed by the plaintiff, Michael J. Horan, the response of the defendants, William Danton and Video Lottery Consultants, Inc. ("VLC"), thereto, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby **FOUND, ADJUDGED, AND ORDERED** as follows:

1.    The Pierce Product does not constitute an upgrade, update, modification, or new version of the Software Assets for the purposes of the Settlement Agreement.

2.    Defendants, William Danton and VLC, did not breach the

1

Settlement Agreement by failing to turn over the Pierce Product to the Plaintiff.

BY THE COURT:

BRENDAN LINEHAN SHANNON
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 95-016 (BLS) |
| PROFESSIONAL VIDEO | ) | |
| ASSOCIATES, INC. | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Jointly Administered |
| ———————————————— | ) | |
| | ) | |
| MICHAEL J. HORAN, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 98-247 |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM DANTON, PROFESSIONAL | ) | |
| VIDEO ASSOCIATION, INC., AND | ) | **Related to Docket Nos. 177** |
| VIDEO LOTTERY CONSULTANTS, | ) | **178 & 179** |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

## MEMORANDUM OPINION[1]

Before the Court is a matter on remand from the United

States Court of Appeals for the Third Circuit. Although this

litigation has a long and complicated history, it now boils down

to this: Under a 1997 Settlement Agreement, the Plaintiff[2] is

entitled to receive and distribute all upgrades, updates,

modifications, and new versions of a software gaming program

---

[1]    This Opinion constitutes the findings of facts and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052.

[2]    All capitalized terms used in this introduction are
defined further herein.

owned by the Defendants.  In 1999, the Defendants developed the

Pierce Product, which the Plaintiff contends should have been

delivered to him as an upgrade, update, modification, or new

version.  The Pierce Product never worked, and the question on

remand is whether something that is "inoperable" constitutes an

upgrade, update, modification, or new version.  The Court

concludes that the Pierce Product is not an upgrade, update,

modification, or new version, so that the Defendants' failure to

deliver it to the Plaintiff is not a breach of the Settlement

Agreement.

**BACKGROUND**[3]

I.    Elimination Draw Poker

In the early 1980's, Michael J. Horan ("Plaintiff") invented

a computer software program called "Elimination Draw Poker"

("EDP").  EDP enabled multiple players to participate against

each other in a computer-operated poker tournament within a

---

[3]    On January 11, 2007, the Court denied the Plaintiff's
request to reopen the record with respect to the issue of whether
the Pierce Product is an upgrade, modification, or new version.
Therefore, the facts and circumstances recounted herein are
substantially derived from the (1) Memorandum Opinion of the
United States District Court for the District of Delaware, see
Horan v. Danton (In re Prof'l Video Ass'n, Inc.), No. 01-488,
2005 WL 189733 (D. Del. Jan. 27, 2005); (2) the subsequent
Opinion of the United States Court of Appeals for the Third
Circuit remanding the current issue for further proceedings
before the Court, see Horan v. Danton (In re Prof'l Video Ass'n,
Inc.), No. 05-1655, 2006 WL 859042 (3d Cir. Apr. 3, 2006); and
(3) the Reproduced Record from the Third Circuit Court of Appeals
[Docket No. 180] submitted by the parties on April 10, 2007.

console or kiosk format.  Between 1983 and 1985, the Plaintiff

obtained a patent for EDP and copyrighted the software program.

In April 1985, the Plaintiff assigned the patent, copyright,

rules, design, format, system, and related hardware for EDP to

Professional Video Association, Inc. ("PVA" or the "Debtor").

II.  The Settlement Agreement

On January 6, 1995, PVA filed its voluntary petition under

chapter 11 of the Bankruptcy Code.  To resolve several ownership

disputes surrounding PVA, the Plaintiff, PVA, William Danton,[4]

and Video Lottery Consultants ("VLC")[5] executed a settlement

agreement (the "Settlement Agreement") which was approved by the

Bankruptcy Court by order dated March 4, 1997.  See Reproduced

Record from the Third Circuit Court of Appeals [Docket No. 180]

[hereinafter Reproduced Record], JAPP 0115-0129.

The Settlement Agreement provides in pertinent part as

follows:

> Horan invented a certain software program
> commercially known as "Elimination Draw
> Poker". . . . "Elimination Draw Poker"
> together with the Patent, related copyrights,
> rules, design, format, system and related
> hardware (the Software Assets) were assigned
> to PVA, a Delaware corporation.

---

[4]    According to the Third Circuit Court of Appeals,
although the Plaintiff initially owned PVA, "an ambiguous
business relationship" involving PVA was developed between Danton
and the Plaintiff.  Horan, 2006 WL 859042, at *3.

[5]    Although not entirely clear on this point, the record
indicates that VLC was a company owned by Mr. Danton.

. . .

> PVA, with the joinder of Danton, hereby
> grants and conveys to Horan, all exclusive
> distribution and all other related rights in
> and to the Software Assets, including any and
> all upgrades, updates, modifications, the
> name and/or new versions in [10 exclusive
> locations], which rights includes [sic] the
> exclusive right to sell, advertise,
> distribute, demonstrate, manufacture and
> duplicate the Software Assets . . . .

Reproduced Record, JAPP 0115-16.  The current dispute arises out
of these provisions of the Settlement Agreement.

III. <u>The Pierce Product</u>

In December 1999, Don Pierce created a software program (the
"Pierce Product") for Fortune Entertainment Corporation ("FEC"),
the Debtor's successor in interest, which followed the basic
rules of EDP.  Reproduced Record, JAPP 0191, 0196, 0204-05.
According to Mr. Pierce, he developed the software by simply
"looking" at EDP and then writing the source code "from scratch",
rather than by obtaining and altering the original source code of
EDP.  Reproduced Record, JAPP 0196.  Ultimately, Mr. Pierce
testified that the software program enabled a video poker
tournament with rules identical to those of EDP, but with new
high-end graphics and the ability to operate the game on personal
computers, rather than on kiosks.  Reproduced Record, JAPP 0191,
0204-05.  Mr. Pierce further testified that, although he created
a "fully functioning" demonstration version of the game, the
"finished version" was determined to be inoperable by Gaming

Laboratories International Corporation ("GLI"), an independent, third-party governmental regulatory body responsible for testing and approving gaming devices. Reproduced Record, JAPP 0198-99. Notwithstanding GLI's determination that the game was not operable, Mr. Pierce testified that the software was 99.9 percent complete and just needed to be "hook[ed] . . . up" to the proper gaming equipment hardware. Reproduced Record, JAPP 0199. According to Mr. Pierce, it was the hardware provided by FEC, not the software itself, that caused the game to be inoperable. Reproduced Record, JAPP 0209-13.

IV.  The Adversary Proceeding

On April 17, 1998, the Plaintiff commenced the above-captioned adversary proceeding (the "Proceeding") against Mr. Danton, PVA, and VLC, alleging, inter alia, that the defendants breached the Settlement Agreement by failing to turn over rights to the Pierce Product.[6]  More specifically, the Plaintiff argues that the Pierce Product constitutes an upgrade, update, modification, or new version of the Software Assets to which he was entitled. On June 4, 2001, following a three day trial, the Bankruptcy Court entered judgment in favor of the defendants.

---

[6]    The Plaintiff's complaint also alleged fraud, misrepresentation, judicial estoppel, and an additional breach of the Settlement Agreement relating to a networking software created by Amusement World, Inc. designed to make EDP an operational game. These counts have been dismissed, and the dismissal was affirmed on appeal. Horan, 2006 WL 859042, at *6.

The holding of the Bankruptcy Court was affirmed by the United States District Court for the District of Delaware, which reasoned:

> Pierce testified at trial that his software was a demonstration model and not operational. In addition, James Maid, president of GLI, testified that GLI performed tests on the device submitted by Pierce. The test results showed that Pierce's device was inoperable and that GLI "couldn't get it to first base." . . . Pierce's Elimination Draw Poker software, therefore, is not a new version of the Software Assets.

Reproduced Record, JAPP 0015-0016.

On appeal from the District Court, the Third Circuit Court of Appeals vacated the District Court's holding, noting:

> The District Court found that because the software was not operational, it was not a "new version" of the Software Assets. Therefore, it reasoned, there was no breach of the settlement agreement. However, the findings on this point beg the question whether something that is "inoperable" counts as an upgrade, update, modification, or new version if it is 99.9 percent complete and just needs to be "hook[ed] . . . up."
>
> We will, therefore, vacate and remand on this point so that the District Court, which may choose to remand to the Bankruptcy Court, may determine the facts relevant to the Pierce product. These facts include the product's effectiveness; its value to PVA, FEC, and Horan; and whether it can be considered an upgrade, etc.

Horan v. Danton (In re Prof'l Video Ass'n, Inc.), No. 05-1655, 2006 WL 859042, at *3 (3d Cir. Apr. 3, 2006).

Following remand from the Court of Appeals, this Court dismissed defendant PVA from the Proceeding in January 2007.[7] Contemporaneously therewith, the Plaintiff sought to reopen the record with respect to the issues on remand. On January 18, 2007, the Court denied Plaintiff's request to reopen the record with respect to the threshold issue of whether the Pierce Product constitutes an upgrade, update, modification, or new version of the Software Assets, but requested briefing and citations to the already substantial record. The Court held in abeyance the Plaintiff's request to reopen the record as to damages until it determines whether the Pierce Product is an upgrade, update, modification, or new version of the Software Assets.

The parties completed briefing on the threshold issue on April 17, 2007. Oral argument was held on May 25, 2007, at which time the Court took the matter under advisement.

This matter is ripe for decision.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (O).

---

[7]    Debtor's Plan of Reorganization was confirmed in 1997 and fully consummated in 1998.

## DISCUSSION

Pursuant to the remand instructions issued by the Third Circuit Court of Appeals, the Court must determine whether the "'inoperable'" Pierce Product "counts as an upgrade, update, modification, or new version if it is 99.9 percent complete and just needs to be 'hook[ed] . . . up.'" <u>Horan</u>, 2006 WL 859042, at *3.

### I.    The Parties' Arguments

In support of its assertions that the Pierce Product constitutes an upgrade, update, modification, or new version, the Plaintiff relies entirely upon the testimony of Mr. Pierce. Mr. Pierce testified that, while he did not obtain EDP's original source code, he developed the Pierce Product by simply "looking" at EDP and writing the source code "from scratch". Reproduced Record, JAPP 0191, 0204-05. To create the Pierce Product, he copied EDP's rules but changed the font and upgraded the graphics. Reproduced Record, JAPP 0196. EDP's rules, the Plaintiff argues, are a component of the Software Assets. <u>See</u> Settlement Agreement at JAPP 0115 ("Horan invented a certain software program commercially known as 'Elimination Draw Poker'. . . . 'Elimination Draw Poker' together with the Patent, related copyrights, rules, design, format, system and related hardware (the Software Assets)"). Thus, the Plaintiff contends that the resulting software developed by Mr. Pierce, with its enhanced

8

graphics and new font, was an upgrade, update, modification, or new version of EDP, entitling the Plaintiff to certain rights pursuant to the Settlement Agreement.

In further support, the Plaintiff argues that the Pierce Product was, in fact, operational, but that the hardware created by FEC to allow the Pierce Product to be networked and played was insufficient. According to Mr. Pierce:

> [Direct Examination]
>
> A.   . . . And basically we had a fully
>      functional of the game [in
>      September of 1999], but it was strictly
>      PC-based.  It wasn't hooked up to the -
>      - it wasn't hooked up to the gaming
>      equipment hardware.
>
>                      . . .
>
> Q.   Is the software complete?
> A.   Yes.  It is as complete as it can be
>      until we had a machine put in front of
>      us.  I would say 99.9 percent.  It's a
>      matter of a couple of days of my
>      programmer just hooking things up.
>      . . .  Our job was complete.
>
>                      . . .
>
> Q.   As of September 9th, you had a working
>      version of this software?
> A.   Demonstration version.  And then - -
>      when we went to GLI we had a finished
>      version.
>
> [Cross Examination]
>
> Q.   . . . The software that you said was
>      99.9 percent complete when it was
>      delivered to GLI means that it was not
>      100 percent complete.  Correct?  By
>      definition.

```
A.   The hardware was nonfunctional.
Q.   No.  The software.
A.   We tested the software on a bank of
     computers.  So the networking software
     did work.  Everything worked within
     computer devices, but I mean, they [FEC]
     dropped the ball.

[Re-Direct Examination]

Q.   Mr. Pierce, Mr. Angstreich just asked
     you whether the software was complete.
A.   Uh-huh.
Q.   And you said it was 99 percent complete.
A.   Well, the software was complete.  It's
     basically like - - you go to the store
     and buy a program and it's not complete
     until it in your computer.
     It needs to be installed into a computer
     that's working.  If you hook it up to
     your old RCA TV set, it won't work.  If
     you hook it up to a functional Pentium
     computer, it runs.
Q.   It's an issue of hardware?
A.   Yes.
```

Reproduced Record, JAPP 0198-0209.  Mr. Pierce's testimony, the

Plaintiff contends, indicates that the Pierce Product was

operational when turned over to FEC for testing by GLI.  It was

the poor quality of the hardware provided by FEC that rendered it

inoperable.  According to the Plaintiff, if Danton and VLC (the

"Defendants") had turned over the Pierce Product, he could have,

pursuant to the Settlement Agreement, acquired or developed the

proper hardware and distributed the game.

In opposition, the Defendants first contend that, because

Mr. Pierce created the Pierce Product "from scratch", it could

never be an upgrade, update, modification, or new version of EDP.

10

More specifically, the Defendants contend that without EDP's source code, patents, designs, and systems to analyze and alter, Mr. Pierce merely developed a new and different software game similar to EDP.

Second, the Defendants disagree with Plaintiff's assertions that the Pierce Product was, in fact, operable. In support, the Defendants highlight Mr. Pierce's testimony that the demonstration model completed in September 1999 was fifteen generations earlier than the Pierce Product which ultimately proved to be inoperable by GLI. Reproduced Record, JAPP 0206-07. Additionally, the Defendants argue that, despite the Plaintiff's contentions, the Pierce Product could not be operational until proper networking hardware was developed that would allow multiple players to play against each other through a central computer.

Finally, the Defendants argue that the inoperable Pierce Product could never be an upgrade, update, modification, or new version, despite that the fact that "it is 99.9 percent complete and just needs to be 'hook[ed] . . . up.'" Horan, 2006 WL 859042, at *3. In support, the Defendants point to the Settlement Agreement, which only grants the Plaintiff rights to distribute, demonstrate, or duplicate upgrades, updates, modifications, or new versions of the Software Assets. Because the Settlement Agreement does not permit the Plaintiff to

11

alter the upgrades, updates, modifications, or new versions of
the Software Assets, the Defendants contend that they were not
obligated to turn over the inoperable Pierce Product so that the
Plaintiff could acquire the proper hardware and distribute the
game.

II. <u>Is the Pierce Product an Upgrade, Update, Modification,
or New Version?</u>

At the outset it is important to note that the Plaintiff's
argument regarding the operability of the Pierce Product is
irrelevant to the issue currently before the Court.  In 2001, the
District Court made a finding that the Pierce Product was
inoperable.  This finding was not overruled by the Third Circuit
Court of Appeals, and therefore, the Court will not revisit it.
Today, the Court is called upon to decide the more refined
question of whether the inoperable Pierce Product constitutes an
upgrade, update, modification, or new version for purposes of the
Settlement Agreement.  The Court concludes that it does not.

The parties represented to the Court at argument that the
terms "upgrade", "update", "modification", and "new version" are
not terms of art and do not have meanings peculiar to the
software or gaming industries.  Therefore, to determine their
meanings, the Court turns to the language of the Settlement
Agreement, deemed unambiguous by the Bankruptcy Court,[8] as well

---

[8]    <u>See</u> Reproduced Record, JAPP 0133.

12

as to the common definitions of the terms.

It is clear that the Settlement Agreement is effectively a distribution agreement rather than a licensing agreement. Under the Settlement Agreement, the Plaintiff is entitled to:

> all exclusive distribution and all other
> related rights in and to the Software Assets,
> including any and all upgrades, updates,
> modifications, the name and/or new versions
> . . ., which rights includes [sic] the
> exclusive right to sell, advertise,
> distribute, demonstrate, manufacture and
> duplicate the Software Assets . . . .
> Horan's exclusive distribution rights arising
> out of the grant of rights to Horan by PVA of
> the Software Assets . . . not limited to:
> any proceeds of sales, advertising,
> sponsorship and/or manufacturing which arises
> or results from the sale, distribution,
> demonstration or duplication of the Software
> Assets by Horan  . . . .

Reproduced Record, JAPP 0116.  While the Plaintiff has argued that he could have developed hardware to make the Pierce Product operable, he was not entitled to do so under the Settlement Agreement.  Rather, he was entitled only to distribution rights. Accordingly, if the Defendants had turned over the rights to the Pierce Product pursuant to the Settlement Agreement, the Plaintiff's only option would have been to distribute an inoperable product.  This clearly conflicts with purpose of the Settlement Agreement and yields the conclusion that the Pierce Product, though "99.9 percent complete", was not an upgrade, update, modification, or new version of the Software Assets as those terms are used in the Settlement Agreement.

The common definitions of "upgrade", "update", "modification", and "new version" also lend support for the Court's conclusion that the Pierce Product should not have been turned over to the Plaintiff.

First, because the Pierce Product was inoperable, it could never be a upgrade. The term "upgrade" means "to raise to a higher level; to improve." XIX THE OXFORD ENGLISH DICTIONARY 293 (James A.H. Murray et al. eds., 2d ed. 1989). EDP was a fully developed and functioning computer software program, while the Pierce Product was inoperable and incomplete. Rather than improving or raising EDP to a higher level, Mr. Pierce developed a product which did not work.

Second, similar to an "upgrade", the Pierce Product is not an "update" of EDP. "Update" means "to bring (information, esp. written material or material recorded in some other form) up to date. . . . New information received or supplied; an updated version of something." Id. at 291. While Mr. Pierce testified that he designed the Pierce Product to have more enhanced graphics than EDP, the Pierce Product was, again, inoperable and incomplete. Thus, it never brought the operable EDP "up to date" and thus cannot be an "update".

Finally, because the Pierce Product was neither operable nor developed from EDP's original source code, it was a not a "modification" or "new version". Those terms are defined as:

14

Modification:  "The action of making changes in an object without altering its essential nature or character . . . ."  IX THE OXFORD ENGLISH DICTIONARY 951.

Version:  "A special form or variant of something."  XIX THE OXFORD ENGLISH DICTIONARY 559.

For the Plaintiff's purposes, the "essential nature" of EDP was that it worked so that he could distribute and presumably profit from it.  The Pierce Product did not work and hence cannot constitute a "modification".  Likewise, though it could be argued that the inoperable Pierce Product could fall under the definition of a new version of a "special form" of EDP, this result strains credulity in light of the stated purposes of the Settlement Agreement.

Moreover, the uncontroverted record reflects that Mr. Pierce did not receive the source code to EDP in order to develop the Pierce Product's rules, design, format, and system.  Reproduced Record, JAPP 0196.  Rather, he merely observed EDP in action and modeled the Pierce Product on it.  This imitation of EDP can not be a "modification" because Mr. Pierce never had access to EDP's source code, which was the foundation for its rules, designs, format, and system.  By this same logic, it could never be a "new version".

At bottom, the record reflects that the Pierce Product did not work.  That it was 99.9 percent complete or one percent

complete makes no difference: under the Settlement Agreement, the Plaintiff could only utilize and distribute a functioning gaming system. EDP was such a working system; the Pierce Product was not operable, was therefore of no value or use to the Plaintiff in light of his limited rights under the Settlement Agreement, and thus was not an upgrade, update, modification, or new version of EDP.

**CONCLUSION**

For the foregoing reasons, the Court concludes the Pierce Product does not constitute an upgrade, update, modification, or new version of the Software Assets. Therefore, the Defendants did not breach the Settlement Agreement by failing to turn over to the Plaintiff certain rights to the Pierce Product.

An appropriate Order follows.


BY THE COURT:


Dated: Wilmington, Delaware
     August 24, 2007      BRENDAN LINEHAN SHANNON
                      United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 95-016 (BLS) |
| PROFESSIONAL VIDEO | ) | |
| ASSOCIATES, INC. | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Jointly Administered |
| | ) | |
| | ) | |
| MICHAEL J. HORAN, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 98-247 |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM DANTON, PROFESSIONAL | ) | |
| VIDEO ASSOCIATION, INC., AND | ) | |
| VIDEO LOTTERY CONSULTANTS, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

Upon consideration of the Objections to Findings of Fact and Conclusions of Law Pursuant to Fed. R. Civ. P. 52 (the "Objection") [Docket No. 187, filed on September 10, 2007] filed by the plaintiff, Michael J. Horan; and the Court deeming the Objection to be a motion to amend findings and judgment under Fed. R. Civ. P. 52(b) and Fed. R. Bankr. P. 7052; and Fed. R. Civ. P. 52(b) imposing a ten day deadline for the filing of a motion to amend findings; and such deadline having expired, by operation of Fed. R. Bankr. P. 9006(a) and (b), on September 4, 2007; it is hereby

ORDERED that the Objection is overruled and the request to amend findings and judgment is denied as untimely.

Dated: Wilmington, Delaware
      September 14, 2007
BRENDAN LINEHAN SHANNON
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number: _Adversary 98-247_ ○BK  ◉AP

If AP, related BK Case Number: _95-016_

_docket 186 ~_
Title of Order Appealed: ① _Order related to Memorandum Opinion_
_docket 188 — ② Order Overruling the Objection to findings_

Docket Number: _____    Date Entered: _____

Item Transmitted:  ◉ Notice of Appeal _& related docket info_  ○ Motion for Leave to Appeal
　　　　　　　　　○ Amended Notice of Appeal     ○ Cross Appeal
　　　　　　　　　Docket Number: _189_    Date Filed: _9/24/07_

*Appellant/Cross Appellant:　　　　　　　　*Appellee/Cross Appellee

_____　　　_____

Counsel for Appellant:　　　　　　　　　Counsel for Appellee:

_____　　　_____
_____　　　_____
_____　　　_____
_____　　　_____
_____　　　_____

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?  ☑Yes  ○No

IFP Motion Filed by Appellant?  ○Yes  ☑No

Have Additional Appeals to the Same Order been Filed?  ○Yes  ☑No
　　If so, has District Court assigned a Civil Action Number?  ○Yes  ☑No  Civil Action # _____

Additional Notes:

_____

_____10/12/07_____　　　　　　　By: _M.E. Behonar_____
Date　　　　　　　　　　　　　　　　Deputy Clerk

_____
　　　　　　　　　　　　　　　FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: _____
7/6/06