IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                   :

PROFESSIONAL VIDEO ASSOC. INC  :       BANKRUPTCY CASE NO. 05-00016

    Debtor                             :

MICHAEL J. HORAN                   :

    Appellant                        :

    v.                                :       CIVL ACTION NO 07-629 GMS

WILLIAM DANTON, et al.             :

    Appellees                        :

---

## APPELLANT'S BRIEF

---

Louis M. Tarasi, Jr., Esqurie
C. William Kenny, Esquire
TARASI & TARASI, P.C.
510 Third Avenue
Pittsburgh, PA  15219
Pro Hac Vice
For Michael J. Horan

Elwyn Evans, Jr., Esquire
Local Counsel for Michael J. Horan

Elwyn Evans, Jr.,  Esquire
1502 N. French Street
P.O. Box 1037
Wilmington, Delaware, 19899
(302) 656-5999

Date Filed: February 19, 2008

I.    TABLE OF CONTENTS

II.    TABLE OF AUTHORITIES ................................................................ i i

III.    STATEMENT OF BASIS OF APPELLATE JURISDICTION ............. 1

IV.    STATEMENT OF ISSUES AND APPLICABLE STANDARD OF REVIEW ............................................................................................... 1

V.    STATEMENT OF THE CASE ............................................................. 3

      A.    Nature of the Case ................................................................ 3
      B.    Statement of Relevant Facts .............................................. 4

VI.    ARGUMENT ....................................................................................... 8

VII.    CONCLUSION .................................................................................. 15

APPENDIX

      Appendix 1 - U.S. 3rd Circuit Ct. Of Appeals
      Appendix 2 - U.S. Bankruptcy Ct. Memo, Opinion & Order
      Appendix 3 - Bankruptcy Court Hearing Transcript

CERTIFICATE OF SERVICE ....................................................................... 17

## II.    TABLE OF AUTHORITIES

### STATUES AND RULES

F.R.C.P. 52 ( c )  ................................................................. 1, 3

28 U.S.C. §158a (1)  ............................................................ 1

Fed. R. Bankr. P. 8013  ....................................................... 1

F.R.E. 801 .......................................................................... 7

### CASES

*Anderson v. Bessemer City,* 470 U.S. 564, 573, 84 L. Ed. 2d 518,
105 S. Ct. 1504 (1985) ......................................................... 2

*Feinmanm v. A. H. Bull S.S. Co.,*107 F. Supp. 153; (E.D. Pa. 1952)  ................ 7

*Frank v. Bloom,* 634 F.2d 1245, 1251 (10th Cir. 1980)  ....................... 8

*Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972)  ............. 8

*In re Gutpelet,* 137 F.3d 748, 750 (3d Cir. 1998)  ............................ 2

*King, Collier on Bankruptcy,* 8013.02, at 8013-4 (15th ed. 1997)  ......... 2

*Meespierson, Inc. v. Strategic Telecom, Inc.,*
202 B.R. 845, 847 (D. Del. 1996)  ......................................... 2

### III.    STATEMENT OF BASIS OF APPELLATE JURISDICTION

The above captioned appeal arises from the final order of August 24, 2007, of the Honorable Brendan Linehan Shannon entering Judgment in favor of the Defendants, and against Plaintiff pursuant to F.R.C.P. 52 (c), setting forth its findings of facts and conclusions of law. Appellate Jurisdiction is vested in this Honorable Court by virtue of 28 U.S.C. §158a (1).

Under 28 U.S.C. § 158(a), the Court has jurisdiction to adjudicate appeals from final judgments, orders and decrees of bankruptcy judges. Pursuant to Federal Rule of Bankruptcy Procedure 8013, the Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

This matter was previously remanded to this Honorable Court from the Third Circuit's remand of the prior appeal of this matter. This Court, as entitled under the Third Circuit's remand, remanded this matter to the Bankruptcy Court. The Third Circuit's mandate to this and the Bankruptcy Court was:

> We will, therefore, vacate and remand on this point so that the District Court, which may choose to remand to the Bankruptcy Court, *may determine the facts relevant to the Pierce product. These facts include the product's effectiveness; its value to PVA, FEC, and Horan; and whether it can be considered an upgrade, etc.*
>
> For the foregoing reasons, we will affirm in part and vacate in part and *remand for further proceedings in accordance with this opinion. (emphasis added)*

(Appendix 1, Third Circuit Opinion and Order, pg. 7  )

### IV.    STATEMENT OF ISSUES AND APPLICABLE STANDARD OF REVIEW

1.    The Bankruptcy Court erred in its construction of an unambiguous contract by failing to give effect to the plain terms of the agreement and by concluding the Settlement Agreement is merely a distribution agreement.

1

2.    The Bankruptcy Court erred by failing to find that the Defendant's breached the unambiguous terms of the agreement by failing to turn over the Pierce Software for Mr. Horan to "duplicate, manufacture and distribute".

In reviewing a case on appeal, the Bankruptcy Court's factual determinations are subject to deference and shall not be set aside unless clearly erroneous. *In re Gutpelet,* 137 F.3d 748, 750 (3d Cir. 1998). Under the clearly erroneous standard of review, "[a] strong presumption exists in favor of the trial court's findings of fact, and the burden of proof is on the party attacking their validity." *King, Collier on Bankruptcy,* 8013.02, at 8013-4 (15th ed. 1997). Accordingly, a reviewing court may not "reverse the findings of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985).

Unlike factual determinations, a bankruptcy court's conclusions of law are subject to plenary review and are considered de novo by the reviewing court. *Meespierson, Inc. v. Strategic Telecom, Inc.,* 202 B.R. 845, 847 (D. Del. 1996).

In the present matter, the Bankruptcy Court's legal conclusion that the "Settlement Agreement" is merely a distribution agreement is subject to plenary review. The Bankruptcy Court's factual determination that the Pierce Product was not an upgrade, update or modification is premised on this erroneous legal conclusion, and is clearly erroneous given the facts in this case.

## V.    STATEMENT OF THE CASE

### A.    Nature of the Case

On January 6, 1995, the defaulting purchasers of Professional Video Association

(hereinafter PVA), formerly owned by the Plaintiff, Michael J. Horan, filed a voluntary

petition under Chapter 11 of the Bankruptcy Code. Disputes over ownership of the Debtor

PVA erupted, and ultimately, the parties to those disputes entered into a "Settlement

Agreement" of February 27, 1997. On April 17, 1998 Plaintiff Michael Horan, initiated an

adversary proceeding at 98-248 against the other parties to this "Settlement Agreement", *viz.*

William Danton, Video Lottery Consultants, Inc. and PVA for claims of breach of contract,

fraud, and judicial estoppel. The adversary proceeding was initiated when, subsequent to the

March 4, 1997 approval by the Bankruptcy Court of the February 27, 1997 Settlement

Agreement (hereinafter Settlement Agreement), the Defendants failed to grant and convey to

Plaintiff Horan the "Software Assets", including any and all upgrades, updates, names and/or

new versions to enable Horan to duplicate and manufacture Elimination Draw Poker terminals

and fulfill his quotas under the terms of the Settlement Agreement.

The trial of this adversary proceeding was held before the Bankruptcy Court over 4

years after the filing of the complaint on February 12, 13 and June 1 of 2001 before the

Honorable M. Bruce McCullough, who replaced Judge Walsh just prior to the trial of the case.

At the close of Plaintiffs case, Judge McCullough granted Defendants' F.R.C.P. 52(c) Motion

to dismiss Plaintiffs three-count adversary complaint alleging 1) Breach of Contract; 2) Fraud,

and 3) Judicial Estoppel. On June 4, 2001, Judge McCullough entered a final order

incorporating by reference his findings of fact as set forth in the transcript of June 1, 2001.

This matter was then appealed to the District Court of Delaware on July 18, 2001.

3

Over three and one half years later, on January 27, 2005, the District Court entered its opinion and order affirming in totality, the Bankruptcy Court's Order of June 4, 2001. Ultimately the matter was heard before the Third Circuit who remanded this matter as follows:

> We will, therefore, vacate and remand on this point so that the District Court, which may choose to remand to the Bankruptcy Court, *may determine the facts relevant to the Pierce product. These facts include the product's effectiveness; its value to PVA, FEC, and Horan; and whether it can be considered an upgrade, etc.*
>
> For the foregoing reasons, we will affirm in part and vacate in part and *remand for further proceedings in accordance with this opinion. (emphasis added)*

(Appendix 1, Third Circuit Opinion and Order, pg. 7 )

This matter was referred by this Court back to the Bankruptcy Court who on August 24, 2007 dismissed the action after determining, incorrectly, that the Settlement Agreement was only a mere distribution agreement, and the Pierce Product could not be an upgrade or update as Mr. Horan could not "manufacture or duplicate" the Pierce Product because he only had "distribution" rights. This timely appealed followed.

      B.     Statement of Relevant Facts

On February 27, 1997, after extensive negotiations, Horan, Danton, VLC, and PVA executed the Settlement Agreement. [JAPP 0115-0129] (JAPP references are to the Reproduced Record of the Third Circuit Court of Appeals filed with the Bankruptcy Court). The Settlement Agreement relates to "Software Assets" that define a patented method of playing poker, in video game console format. The terms of this settlement agreement have been determined by the Bankruptcy Court to be unambiguous. [JAPP 0133] Per the unambiguous terms of the Settlement Agreement, Mr. Horan, Danton and VLC all agreed that:

      1.     Horan invented a certain computer software program commercially

4

known as "Elimination Draw Poker". "Elimination Draw Poker" was patented at Patent No. 4,648,604 (the Patent). "Elimination Draw Poker" together with the Patent, related copyrights, rules, design, format, system and related hardware (the Software Assets) were assigned to PVA, a Delaware Corporation. [JAPP 0115]

2.   Danton and PVA warranted that PVA has exclusive ownership of the Software Assets and, subject to approval of the Bankruptcy Court as set forth herein, had the authority and power to transfer, convey, assign, sell, or grant the exclusive rights to the Software Assets as set forth herein to Horan.  Danton and PVA acknowledged that this was a material representation of PVA and Danton and that Horan relied on such representations and warranty in connection with this Settlement Agreement. [JAPP 0123]

3.   PVA, with the joinder of Danton, agreed to grant and convey to Horan, all exclusive distribution and all other related rights in and to the Software Assets, including any and all upgrades, updates, modifications, the name and/or new versions in 10 exclusive locations, which rights included the exclusive right to sell, advertise, distribute, demonstrate, manufacture and duplicate the Software Assets [JAPP 00116]

4.   That immediately upon the execution of the Settlement Agreement, the Parties would take the necessary steps to have the Settlement Agreement presented to the Bankruptcy Court for its approval.  [JAPP 0121]

5.   That the Settlement Agreement was subject to and contingent upon approval of the United States Bankruptcy Court in the District of Delaware at Bankruptcy Case No. 95-00016 and an Order of Court granting the rights in the Software Assets in the Exclusive Locations as set forth herein in paragraph 1 to Horan, free and clear of all liens, claims and encumbrances. [JAPP 0121]

On March 4, 1997, this Bankruptcy Court approved the Settlement Agreement over the

objection of Steven Holniker, President of Amusement World, Inc., who had developed an

upgrade, update, name and/or new version of the "Software Assets" for the game Elimination

Draw Poker. [JAPP 0321]  Amusement World, Inc., through its president Steven Holniker,

claimed the Defendants, through the Settlement Agreement, were attempting to convey its

software to Horan.  [JAPP 0401]  Amusement World, Inc., appealed the Court's Order

approving the settlement agreement, [JAPP 0401] April of 1997.  Amusement World, Inc.

5

withdrew this appeal later that same year. [JAPP 0401-402]

The parties to the settlement agreement, approved by the Court on March 4, 1997,

closed on the agreement in late August of 1997 after Mr. Holniker withdrew his appeal, and

Mr. Horan made his second demand upon Mr. Danton to "turn over the software assets" [JAPP

508-509, see also JAPP 829] Specifically, Mr. Horan demanded:

> This notification is my second request for you to hand over the PVA Software Assets.
> The Software Assets should include any and all upgrades, updates, modifications, and
> specific instructions and data to duplicate the software for manufacturing for my
> exclusive locations.

[JAPP 829]

Mr. Danton has continually advised Mr. Horan that neither he nor his entities owned

the software assets or the upgrades, etc. [JAPP 0509; JAPP 829]

In December of 1999, Don Pierce, a software developer, created a new version of the

PVA Elimination Draw Poker game for FEC, who had purchased PVA and the PVA Patents,

and copyrights subject to the Settlement Agreement at issue in this case. [JAPP 887].

Mr. Pierce testified that in December of 1999, he produced a complete software

package for FEC that ran the PVA Elimination Draw Poker Game on a Personal Computer.

[JAPP 0190]

In his opinion of August 8, 2000, the Honorable Peter J. Walsh, then the Bankruptcy

Court Judge assigned to this adversary proceeding, ruled that the term "Software Assets" as set

forth in the "Background" paragraph of the Settlement Agreement included a computer

software program called Elimination draw poker, together with the patent, related copyrights,

rules design, format, system and related hardware that Horan assigned to Defendant PVA in

1985. Mr. Hopkins, Plaintiffs' expert at trial, explained what components that comprise the

related hardware to run the Elimination Draw Poker Game. Specifically, he testified that

6

related hardware would include, 1) touch screen unit, CPU and motherboard, keyboard, printer. Defendants stipulated at trial that these elements comprise the related hardware. [JAPP 0274]

Defendants have judicially admitted that Software Assets as defined, granted and conveyed to Horan under the unambiguous terms of the settlement agreement includes operational software. Specifically, Defendants judicially admitted in the Pre-Trial Order filed in this case, in paragraph 3, under the heading "Facts which are admitted and require no proof"

> 3.   Danton agreed that in the event that he or his entity came up with a software program so that he didn't need Holniker, he'd give Horan use of that, to the extent that we changed the game, we would give Horan that also. [Angstreich Deposition, April 7, 1999, page 19, lines 11-16 and JAPP 0827-0828] F.R.E. 801
>
>> *Under the terms of the Settlement Agreement, Mr. Horan is entitled to all exclusive distribution and all other related rights in and to the Software Assets, including any and all upgrades, updates and modifications, the name and/or new versions in . . . exclusive locations, which rights include the exclusive right to sell, advertise, distribute, demonstrate, manufacture and duplicate the Software Assets in only the . . . exclusive locations.* F.R.E. 801

[JAPP 0778]

Judicial Admissions are binding upon a party. The vital feature of a judicial admission is universally conceded to be its conclusiveness upon the party making it, i.e. the prohibition of any further dispute of the fact by him, and of any use of evidence to disprove or contradict it. ***Feinmanm v. A. H. Bull S.S. Co.,***107 F. Supp. 153; (E.D. Pa. 1952 )

Defendants have judicially admitted that "if Danton or his entity came up with a software program such that they didn't need Holniker" they would give that to Horan.

Defendants' judicial admission that they would have to give Mr. Horan any operational software they acquired or developed is an admission of fact that they cannot contradict. Judicial admissions are binding for purposes of the case in which they are made.

7

*Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972)  *Frank v. Bloom,* 634 F.2d 1245, 1251 (10th Cir. 1980) (client bound by lawyer's admissions on his behalf, even if later repudiated by client; such admissions are statements by client's agent acting within the scope of employment)

The fact that Defendants have judicially admitted that under the agreement they were required to give to Mr. Horan any operational software they acquire or develop, also acts as an admission that the definition of Software Assets including all upgrades, updates, modifications, the name and/or new versions includes such operational software. As operational software exists, in Pierce's products, Defendants were required to give them to Horan for duplication and manufacture.

### VI.    ARGUMENT

6.          The Bankruptcy Court erred in its construction of an unambiguous contract by failing to give effect to the plain terms of the agreement and by concluding the Settlement Agreement is merely a distribution agreement.

The Bankruptcy Court concluded that "it is clear that the Settlement Agreement is effectively a distribution agreement rather than a licensing agreement." (Appendix 2, Bankrutpcy Court Opinion, pg. 13)  The unambiguous Settlement Agreement provides that Mr. Horan received more than mere distribution rights.  In fact, he received, per the unambiguous terms of the agreement, "The right to sell, advertise, distribute, demonstrate, manufacture and duplicate the Software Assets". (JAPP 0116) Accordingly, the Bankruptcy Court's conclusion that this is merely a distribution agreement is not supported by the facts in this case.  As the agreement is unambiguous, the Bankruptcy Court has erred in concluding factually and legally that the settlement agreement is merely a distribution agreement.

8

The Bankruptcy Court erroneously concluded, because of this factual and legal error in construing the Settlement Agreement that "Plaintiff has argued that he could have developed hardware to make the Pierce Product operable, he was not entitled to do so under the Settlement Agreement." (Appendix 2, Bankruptcy Court Opinion, pg. 13)

To the contrary, Mr. Horan, by virtue of the unambiguous Settlement Agreement was not required to use any hardware used by Defendants. He could use his own hardware, and manufacture or duplicate the Software Assets per the unambiguous terms of the agreement. Only in erroneously concluding that the Settlement Agreement is merely a "distribution" agreement, could the Bankruptcy Court also erroneously conclude that Mr. Horan was restricted in any manner in his use of the "Software Assets" including, any and all upgrades, updates, names and/or new versions.

This Bankruptcy Court itself sets forth this erroneous conclusion, despite the clear, unambiguous terms of the agreement as follows:

> Rather, he was entitled only to distribution rights. Accordingly, if the Defendants' had turned over the rights to the Pierce Product pursuant to the Settlement Agreement, the Plaintiff's only option would have been to distribute an inoperable product. This clearly conflicts with purpose [sic] of the Settlement Agreement and yields the conclusion that the Pierce Product, though "99.9 percent complete", was not an upgrade, update, modification, or new version of the Software Assets as those terms are used in the Settlement Agreement."

(Appendix 1, Opinion, pg. 13)

In other words, because the Bankruptcy Court erroneously concluded that Mr. Horan only received the right to distribute under the Settlement Agreement, he was not entitled to utilize the Pierce Product, complete but for hooking up to hardware, because he could not complete it himself, using his own hardware. This conclusion, is clearly incorrect where the Settlement Agreement specifically provides Mr. Horan with the rights not only to distribute the Software

9

Assets, but also to manufacture, duplicate, advertise , sell, demonstrate any and all upgrades, updates, names and or new versions of the "Software Assets". (JAPP 0116)

This argument, adopted by the Bankruptcy Court, was rejected during oral argument at the Third Circuit. Specifically, the pertinent part of the Third Circuit transcript of the argument is here quoted.

JUDGE 1:    Well, let me ask you a question. Even if it wasn't operational, if you had the obligation to turn it over, I'm not talking about the first Holnicker thing, why wouldn't you turn it over whether or not it was operable. Because if he wants it he wants it, maybe he can make it operable.

SEA:    Your Honor, if we turned over ........Assume that we should have turned it over, it's worthless, it's not operational.

JUDGE 1:    Well so what? But he wants it, he comes in.... Suppose I want something, I pay for something that's worthless, am I not entitled to the work with something if I want it?

SEA:    If you were suing me for specific performance that would be one thing. You're suing me for damages, the question becomes one of, where are the damages that he presented in his case....

JUDGE 1:    That's a separate issue as to whether there were damages. One issue is was he entitled to it, then they have to go back and see whether there were damages. But if you agree he was entitled to it, then I don't see why he shouldn't get it.

SEA:    I disagree. You cannot assert that the purpose of that contract was to give him something that we tried and we failed at it to make it work.

JUDGE 1:    Maybe he doesn't believe you. Maybe he thinks that there is some value in it.

SEA:    Your Honor, we would be in the next case if had turned this over to him as a modification and he tried to use it and he failed and lost money, then we have been sued for giving him worthless modifications.

JUDGE 1:    If you turned it over with a disclaimer, and it says that we are giving you this but we don't think there is any value to it. But if you want it here it is, then why shouldn't you have been required to do that?

SEA:    Again there are 2 reasons.  One is whether or not FEC, Fortune Entertainment Corporation is the equivalent of PVA......

JUDGE 1:    Now you are going into a separate issue.  The first time you said you didn't turn it over because it wasn't operable.

(Appendix 3, Transcript of Oral Argument, Third Circuit, 2-27-06)

The Pierce Product clearly falls within the "any and all" provision of the Software Assets, which included upgrades, updates, names and or new versions.  That list does not limit the "any and all" as the Bankruptcy Court suggests, but provides that it is meant to include any and all Software Assets, including the Pierce Product.

2          The Bankruptcy Court erred by failing to find that the Defendant's breached the unambiguous terms of the agreement by failing to turn over the Pierce Software for Mr. Horan to "duplicate, manufacture and distribute".

The Bankruptcy Court next concludes that because the Pierce Product was inoperable, it could not be an upgrade.  (Appendix 2, Bankruptcy Court Opinion, pg 14)  The Pierce Product was only inoperable because it was not connected to working hardware within a gaming cabinet. It was working on PC hardware and could have, according to Mr. Pierce, easily been made to work on a gaming cabinet that was complete.

The Bankruptcy Court also concluded it could not be an "upgrade" also, because it was inoperable.  Again, though the Bankruptcy Court notes that it had upgraded graphics, it erroneously concluded that because it did not operate on the junk gaming cabinet supplied by Danton, FEC, PVA, it was inoperable.  And because the Bankruptcy Court concludes that Mr. Horan was not entitled to do anything but to distribute the software with Defendant's hardware, despite having the right to manufacture and duplicate the Software Assets under the unambiguous terms of the Settlement Agreement, the Bankruptcy Court concludes it can't be an

11

upgrade that Mr. Horan could make use of on his own hardware. Again, these conclusions are based on factual and legal errors, specifically the legal error of construing the Settlement Agreement narrowly to a mere distribution agreement when the unambiguous Settlement Agreement provides many more rights than just distribution. Specifically:

This Bankruptcy Court again, erroneously concludes that because the Pierce Product was inoperable, it could not be a modification or a new version of the EDP's original source code. The Bankruptcy Court stated:

> "For the Plaintiff's purpose, the "essential nature" of the EDP was that it worked so that he could distribute and presumably profit from it. The Pierce Product did not work and hence cannot constitute a "modification.""

(Appendix 2, Bankruptcy Court Opinion, pg 14)

The Pierce Product did in fact work, just not on the junk gaming cabinet supplied by Defendants. It worked on computers, and could have been distributed on such hardware. Nothing in the Settlement Agreement states to the contrary.

Moreover, because Mr. Horan was entitled to manufacture and duplicate the Software Assets, he could have manufactured different gaming cabinets and duplicated the software on those. Because the Bankruptcy Court has misconstrued the Settlement Agreement, it does not address this reality. Only in erroneously concluding that Mr. Horan had no more than mere distribution rights, and in erroneously concluding that the Pierce Product was inoperable, could the Bankruptcy Court reach its conclusion to dismiss this case. Neither conclusion is supported in the record, nor in the Settlement Agreement.

In fact, the software was operational, as was stated by Mr. Pierce both on direct and cross examination.

BY MR. ANGSTREICH:

12

Q.   Mr. Pierce, I'm trying to find out whether or not - - let me rephrase that. The software that you said was 99.9 percent complete when it was delivered to GLI means that it was not 100 percent complete. Correct? By definition.

A.   the hardware was nonfunctional.

Q.   No. The software.

A.   We tested the software on a bank of computers. So the networking software did work. Everything worked within computer devices, but I mean, they dropped the ball.

[JAPP 0205-0206]

Q.   Mr. Pierce, Mr. Angstreich just asked you whether the software was complete.

A.   Uh-huh.

Q.   And you said it was 99 percent complete.

A.   Well, the software is complete. It's basically like - - you go to the store and buy a program and it's not complete until you install it in your computer. It needs to be installed into a computer that's working. If you hook it up to your RCA TV set, it won't work. If you hood it up to a functional Pentium computer, it runs.

Q.    It's an issue of hardware?

A.   Yes.

[JAPP 0209]

Finally, this Bankruptcy Court erroneously concluded that the District Court ruled that the Pierce Product was not operational, and the Third Circuit did not overrule this finding. This conclusion is incorrect. The District Court did not conclude the software was inoperable, but determined it did not need to be turned over because it did not operate on the gaming cabinet provided by Defendants. The Third Circuit, during oral arguments pointed this out to Defendants.

Specifically, the pertinent part of the Third Circuit transcript of the argument is here quoted.

JUDGE 3:    Wasn't that the reason Pierce was working on that software so he could develop the software to improve Horan's software.

13

SEA:   Yes that's right, Your Honor, there was an effort to make it better and Mr. Pierce, according to Mr. Mada, who was Mr. Horan's witness, said it didn't work it was worthless.

JUDGE 3:     Well, if it had worked, would it not have been used as an upgrade in the electronic draw poker?

SEA:   If it had been successful, if had been a true modification and an upgrade, it might have, in fact.......

JUDGE 1:     You can't say it might, it either would or it wouldn't have.

SEA:   Well we don't know if it would have interfaced with Mr. Holnicker's software which was necessary in order to get the two computers to speak to each other.

JUDGE 2:     Well Mr. Angstreich should we send this back for more fact finding?

SEA:   No, Your Honor, I don't think that would be necessary.

JUDGE 1:     Why not?

SEA:   Because I think that the issue is whether or not under the terms of the contract Mr. Horan has proven that we breached the agreement with respect to the Pierce transaction.  Either because it wasn't PVA and Danton under the terms of the contract or because it was worthless and therefore did not qualify for an upgrade or modification that needed to be turned over.

JUDGE 3:     Why should he make that decision?  It seems to fall within the language with the agreement, any and all upgrades.  Why shouldn't he make the decision whether it is an upgrade, whether in fact it works with his program.

(Appendix 3, Transcript of Oral Argument, Third Circuit, 2-27-06)


The Third Circuit noted that the District Court never determined that the Pierce Product was useless.  In fact, it remanded this matter back to this Bankruptcy Court to determine the product's effectiveness, *i.e.* the Pierce Product's effectiveness.  The testimony of record is clear that the Pierce Product, *i.e.* the software, worked on PC Hardware, but was not working on the junk gaming cabinet provided by Defendants.  The Software was complete.

The products effectiveness relates to its operability in light of the facts disclosed during

14

trial. Specifically that it operated on PC hardware, but not on the junk gaming cabinet cobbled together from scraps that was provided by Defendants to Mr. Pierce. That does not mean that it could not work on other hardware, and as Mr. Horan was not merely restricted to a distribution right, but had the rights to manufacture and duplicate the software. Mr. Horan was entitled to the Pierce Product, *i.e.* the software, and to manufacture, duplicate and distribute the same on his own hardware as set forth specifically and unambiguously under the Settlement Agreement. Defendants breached the Settlement Agreement by not providing the Pierce Product, *i.e.* the software, to Mr. Horan as agreed to under the unambiguous terms of the Settlement Agreement. Mr. Horan was specifically and unambiguously entitled to any and all upgrades, updates, modifications, names and or new versions of the Software Assets so that he could manufacture, duplicate and distribute the same in his exclusive territories.

## VII.    CONCLUSION

WHEREFORE, PLAINTIFF respectfully requests that this Honorable Court reverse the Bankruptcy Court's dismissal, confirm the unambiguous terms of the agreement, confirm the uncontradicted evidence of record, and remand this matter back to the Bankruptcy Court for a determination of damages for Defendants' breach of the Settlement Agreement by not providing to Mr. Horan the Pierce Product so that he could distribute, manufacture and duplicate the same in accordance with the rights he obtained under the unambiguous settlement agreement.

Respectfully submitted,

TARASI & TARASI, P.C.

By: _____

Louis M. Tarasi, Jr., Esquire
C. William Kenny, Esquire
Attorneys for Plaintiff

510 Third Avenue
Pittsburgh, PA 15219
Phone # 412-391-7135
Fax #: 412-471-2673
E-Mail: lmt@tarasilaw.com

**/s/ Elwyn Evans, Jr., Esquire**
Elwyn Evans, Jr., Esquire
Local Counsel Horan
Del I.D. #2153
ELWYN EVANS, Jr., ATTORNEY AT
LAW
1502 N. French Street
Wilmington, DE 19801

Date Filed: February 19, 2008

**NOT PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

No. 05-1655

---

IN RE: PROFESSIONAL VIDEO ASSOCIATION, INC.
*Debtor*

MICHAEL J. HORAN,
*Appellant*

v.

WILLIAM DANTON; VIDEO LOTTERY CONSULTANTS, INC.; PROFESSIONAL VIDEO ASSOCIATION, INC.

---

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 01-cv-00488)
District Judge: Gregory M. Sleet

---

Argued: February 27, 2006

Before: SLOVITER, FUENTES, and BECKER, *Circuit Judges*

(Filed April 3, 2006)

ELWYN EVANS, JR., ESQ.
Suite 100
1232 King Street
Wilmington, DE 19899

— APPENDIX 1 —

LOUIS M. TARASI, JR., ESQ. (ARGUED)
COLM W. KENNY, ESQ.
Tarasi, Tarasi & Fishman
510 Third Avenue
Pittsburgh, PA 15219

　　*Attorneys for Appellant*

STEVEN E. ANGSTREICH, ESQ. (ARGUED)
Levy, Angstreich, Finney, Baldante, Rubenstein & Coren
1616 Walnut Street
5th Floor
Philadelphia, PA 19103

　　*Attorney for Appellees William Danton and Video Lottery Consultants, Inc.*

PACE REICH, ESQ. (ARGUED)
Pace Reich, P.C.
726 Meetinghouse Road
Elkins Park, PA 19027

　　*Attorney for Appellee Professional Video Association*

———

## OPINION OF THE COURT

———

BECKER, *Circuit Judge*.

This appeal by Michael Horan arises out of a dispute over a settlement agreement arrived at in Bankruptcy Court. Horan was a party to the settlement agreement, which relates to software rights. Horan first claims that the Bankruptcy and District Courts erred in their construction of the settlement agreement. He maintains that there was a breach of

2

the unambiguous terms of the agreement. He further claims that there was fraud under the agreement.

The critical question is whether Horan was entitled to certain software rights that he did not receive. The facts and procedural history are extremely complicated, but they are well known to the parties for whom we principally write. Hence we set forth only the basic background facts and limit our discussion largely to our *ratio decidendi*.

Horan is the Plaintiff. The Defendants are William Danton, Video Lottery Consultants, Inc., and Professional Video Association. In the 1980s, Horan invented a computer software program called "Elimination Draw Poker." Elimination Draw Poker operates in video game console format and allows players to engage in a computer-operated poker tournament. Horan copyrighted the program and obtained a patent for the game. Later, Elimination Draw Poker, its patent, copyright, rules, design, format, system and related hardware – termed "the Software Assets" by the settlement agreement at issue – were assigned to Professional Video Association ("PVA"). This assignment took place on or about April 27, 1985. Horan initially owned PVA, though eventually Horan and Danton developed an ambiguous business relationship involving the company.

According to the District Court, in 1993, Stephen Holniker, President of Amusement World, obtained the operating software for Elimination Draw Poker. Amusement World began to manufacture the game for PVA for demonstration only. In 1995, Amusement World developed network software to make the game operational.

3

Defaulting purchasers of PVA filed for Chapter 11 bankruptcy on January 6, 1995. Apparently, there were several disputes between Danton and Horan regarding the ownership of PVA. To resolve growing problems, a settlement agreement was entered on February 27, 1997, between Horan, Danton, Video Lottery Consultants ("VLC"), and PVA.[1] The terms of the settlement agreement are at issue in this appeal. As stated above, Horan claims that under the agreement he is entitled to certain software rights that he never received.

I.

The relevant portions of the settlement agreement state:

"Elimination Draw Poker" was patented at Patent No. 4,648,604 (the Patent). "Elimination Draw Poker" together with the Patent, related copyrights, rules, design, format, system and related hardware (the Software Assets) were assigned to PVA, a Delaware Corporation.

. . .

### 1. <u>GRANT OF EXCLUSIVE RIGHTS TO SOFTWARE ASSETS; INTERNET.</u>

a. PVA, with the joinder of Danton, hereby grants and conveys to Horan, all exclusive distribution and all other related rights in and to the Software Assets, *including any and all upgrades, updates, modifications, the name and/or new versions in* [several exclusive locations]. Horan's exclusive distribution rights arising out of the grant of rights to Horan by PVA of the Software Assets as set forth herein include, but are not limited to: any proceeds of sales, advertising, sponsorship and/or manufacturing which arises or results from the sale, distribution, demonstration or duplication of the Software Assets by Horan in the Exclusive Locations.

. . .

---

[1]VLC was owned by Danton, but little else is explained by the record.

4

6. **WARRANTY OF OWNERSHIP.** Danton and PVA warrants that PVA has exclusive ownership of the Software Assets and, subject to approval of the Bankruptcy Court as set forth herein, has the authority and power to transfer, convey, assign, sell, or grant the exclusive rights to the Software Assets as set forth herein to Horan. Danton and PVA acknowledges that this is a material representation of PVA and Danton and Horan is relying on such representations and warranty in connection with the Settlement Agreement.

(emphasis added.)

The agreement was entered despite an objection by Stephen Holniker. As stated above, Holniker's company, Amusement World, developed software for Elimination Draw Poker. Holniker was afraid that the agreement attempted to convey his company's software to Horan. Holniker's objection to the settlement agreement was denied. He then appealed the Bankruptcy Court's order approving the settlement, but later withdrew the appeal. According to Holniker, both Danton and Horan stated that they had no interest in his software. Moreover, a pre-trial order, including facts stipulated by all parties, states that Horan "at all times knew that he himself was not entitled to any ownership rights to the 'software program' owned by Amusement World, Inc."

On the basis of the agreement, Horan now appears to claim rights in:

(1) The new "version" of software created by Holniker and Amusement world;

(2) Software utilized in 38 machines that VLC purchased from Holniker and Amusement World in 1996;

(3) Software developed by Don Pierce for Fortune Entertainment Corporation ("FEC").

5

II.

Against this background, we conclude the following:

First, Horan has no rights to the Holniker software. We agree with the Bankruptcy and District Courts that there is no ambiguity in the agreement such as might give Horan the rights to upgrades, updates, modifications, names, or new versions ("upgrades, etc.") not possessed or owned by PVA, but only by Holniker. Instead, PVA was only required to convey rights to that which it developed or acquired. Even if the settlement agreement were ambiguous, extrinsic evidence establishes that it was not the intent of the parties for PVA to convey to Horan any and all upgrades, etc. that existed *anywhere*. For example, the pre-trial order cited above states that Horan knew that he was not entitled to rights in the Holniker software. In short, the Bankruptcy and District Courts did not err in their construction of the settlement agreement as it relates to the Holniker software. Accordingly, we affirm on this point.

Second, the claim of fraud under the agreement is totally without foundation. We affirm on this point as well.

Third and finally, however, we will remand Horan's claim that Defendants failed to convey the rights in software created by software developer Don Pierce. In December of 1999, Pierce created a software package to run Elimination Draw Poker on a personal computer for FEC. FEC is apparently PVA's successor in interest and Danton appears to have been involved with both companies.

6

Horan contends that Pierce created a "new version" of the software and that, therefore, Horan is entitled to certain rights. Pierce testified that the software was not operational. Additionally, a regulatory firm that tests and approves gaming devices found Pierce's version of Elimination Draw Poker to be inoperable. On the other hand, Pierce also testified that the software was 99.9 percent complete and only needed hardware to be plugged in to operate. According to Pierce, that would take only a "couple days." Pierce stated that a demonstration version of the software had been completed and that "[e]verything worked."

The District Court found that because the software was not operational, it was not a "new version" of the Software Assets. Therefore, it reasoned, there was no breach of the settlement agreement. However, the findings on this point beg the question whether something that is "inoperable" counts as an upgrade, update, modification, or new version if it is 99.9 percent complete and just needs to be "hook[ed] . . . up."

We will, therefore, vacate and remand on this point so that the District Court, which may choose to remand to the Bankruptcy Court, may determine the facts relevant to the Pierce product. These facts include the product's effectiveness, its value to PVA, FEC, and Horan, and whether it can be considered an upgrade, etc.

For the foregoing reasons, we will affirm in part and vacate in part and remand for further proceedings in accordance with this opinion.

7

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-1655

IN RE: PROFESSIONAL VIDEO ASSOCIATION, INC.

*Debtor*

MICHAEL J. HORAN;

*Appellant*

v.

WILLIAM DANTON; VIDEO LOTTERY CONSULTANTS, INC.; PROFESSIONAL
VIDEO ASSOCIATION, INC.

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 01-cv-00488)
District Judge: Gregory M. Sleet

Argued: February 27, 2006

Before: SLOVITER, FUENTES, and BECKER, *Circuit Judges*

(Filed April 3, 2006)

JUDGMENT

This cause came on to be considered on the record from the United States District Court
for the District of Delaware and was argued on February 27, 2006.

On consideration whereof, it is now hereby ADJUDGED and ORDERED that the
order of the district court entered January 27, 2005, be and the same is hereby affirmed in

part, vacated in part, and remanded for further proceedings consistent with this opinion.
Parties to bear their own costs.

Attest:

/s/ Marcia M. Waldron
Clerk

DATED: April 3, 2006

Certified as a true copy and issued in lieu
of a formal mandate on  5/11/06

Teste:  *Marcia M. Waldron*
Clerk, U.S. Court of Appeals for the Third Circuit

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) |
| | ) Case No. 95-016 (BLS) |
| PROFESSIONAL VIDEO | ) |
| ASSOCIATES, INC. | ) Chapter 11 |
| | ) |
| Debtor. | ) Jointly Administered |
| | ) |
| _____ | ) |
| | ) |
| MICHAEL J. HORAN, | ) |
| | ) |
| Plaintiff, | ) Adv. Proc. No. 98-247 |
| | ) |
| v. | ) |
| | ) |
| WILLIAM DANTON, PROFESSIONAL | ) |
| VIDEO ASSOCIATION, INC., AND | ) Related to Docket Nos. 177 |
| VIDEO LOTTERY CONSULTANTS, | ) 178 & 179 |
| INC., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## MEMORANDUM OPINION[1]

Before the Court is a matter on remand from the United States Court of Appeals for the Third Circuit. Although this litigation has a long and complicated history, it now boils down to this: Under a 1997 Settlement Agreement, the Plaintiff[2] is entitled to receive and distribute all upgrades, updates, modifications, and new versions of a software gaming program

_____

[1]    This Opinion constitutes the findings of facts and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2]    All capitalized terms used in this introduction are defined further herein.

1

- APPENDIX 2 -

owned by the Defendants. In 1999, the Defendants developed the Pierce Product, which the Plaintiff contends should have been delivered to him as an upgrade, update, modification, or new version. The Pierce Product never worked, and the question on remand is whether something that is "inoperable" constitutes an upgrade, update, modification, or new version. The Court concludes that the Pierce Product is not an upgrade, update, modification, or new version, so that the Defendants' failure to deliver it to the Plaintiff is not a breach of the Settlement Agreement.

### BACKGROUND[3]

I.    Elimination Draw Poker

In the early 1980's, Michael J. Horan ("Plaintiff") invented a computer software program called "Elimination Draw Poker" ("EDP"). EDP enabled multiple players to participate against each other in a computer-operated poker tournament within a

---

[3]    On January 11, 2007, the Court denied the Plaintiff's request to reopen the record with respect to the issue of whether the Pierce Product is an upgrade, modification, or new version. Therefore, the facts and circumstances recounted herein are substantially derived from the (1) Memorandum Opinion of the United States District Court for the District of Delaware, see Horan v. Danton (In re Prof'l Video Ass'n, Inc.), No. 01-488, 2005 WL 189733 (D. Del. Jan. 27, 2005); (2) the subsequent Opinion of the United States Court of Appeals for the Third Circuit remanding the current issue for further proceedings before the Court, see Horan v. Danton (In re Prof'l Video Ass'n, Inc.), No. 05-1655, 2006 WL 859042 (3d Cir. Apr. 3, 2006); and (3) the Reproduced Record from the Third Circuit Court of Appeals [Docket No. 180] submitted by the parties on April 10, 2007.

console or kiosk format.  Between 1983 and 1985, the Plaintiff obtained a patent for EDP and copyrighted the software program. In April 1985, the Plaintiff assigned the patent, copyright, rules, design, format, system, and related hardware for EDP to Professional Video Association, Inc. ("PVA" or the "Debtor").

II.    The Settlement Agreement

On January 6, 1995, PVA filed its voluntary petition under chapter 11 of the Bankruptcy Code.  To resolve several ownership disputes surrounding PVA, the Plaintiff, PVA, William Danton,[4] and Video Lottery Consultants ("VLC")[5] executed a settlement agreement (the "Settlement Agreement") which was approved by the Bankruptcy Court by order dated March 4, 1997.  See Reproduced Record from the Third Circuit Court of Appeals [Docket No. 180] [hereinafter Reproduced Record], JAPP 0115-0129.

The Settlement Agreement provides in pertinent part as follows:

> Horan invented a certain software program commercially known as "Elimination Draw Poker". . . . "Elimination Draw Poker" together with the Patent, related copyrights, rules, design, format, system and related hardware (the Software Assets) were assigned to PVA, a Delaware corporation.

---

[4]    According to the Third Circuit Court of Appeals, although the Plaintiff initially owned PVA, "an ambiguous business relationship" involving PVA was developed between Danton and the Plaintiff.  Horan, 2006 WL 859042, at *3.

[5]    Although not entirely clear on this point, the record indicates that VLC was a company owned by Mr. Danton.

. . .

> PVA, with the joinder of Danton, hereby
> grants and conveys to Horan, all exclusive
> distribution and all other related rights in
> and to the Software Assets, including any and
> all upgrades, updates, modifications, the
> name and/or new versions in [10 exclusive
> locations], which rights includes [sic] the
> exclusive right to sell, advertise,
> distribute, demonstrate, manufacture and
> duplicate the Software Assets . . . .

Reproduced Record, JAPP 0115-16. The current dispute arises out

of these provisions of the Settlement Agreement.

III. The Pierce Product

In December 1999, Don Pierce created a software program (the

"Pierce Product") for Fortune Entertainment Corporation ("FEC"),

the Debtor's successor in interest, which followed the basic

rules of EDP. Reproduced Record, JAPP 0191, 0196, 0204-05.

According to Mr. Pierce, he developed the software by simply

"looking" at EDP and then writing the source code "from scratch",

rather than by obtaining and altering the original source code of

EDP. Reproduced Record, JAPP 0196. Ultimately, Mr. Pierce

testified that the software program enabled a video poker

tournament with rules identical to those of EDP, but with new

high-end graphics and the ability to operate the game on personal

computers, rather than on kiosks. Reproduced Record, JAPP 0191,

0204-05. Mr. Pierce further testified that, although he created

a "fully functioning" demonstration version of the game, the

"finished version" was determined to be inoperable by Gaming

Laboratories International Corporation ("GLI"), an independent, third-party governmental regulatory body responsible for testing and approving gaming devices. Reproduced Record, JAPP 0198-99. Notwithstanding GLI's determination that the game was not operable, Mr. Pierce testified that the software was 99.9 percent complete and just needed to be "hook[ed] . . . up" to the proper gaming equipment hardware. Reproduced Record, JAPP 0199. According to Mr. Pierce, it was the hardware provided by FEC, not the software itself, that caused the game to be inoperable. Reproduced Record, JAPP 0209-13.

IV.   The Adversary Proceeding

On April 17, 1998, the Plaintiff commenced the above-captioned adversary proceeding (the "Proceeding") against Mr. Danton, PVA, and VLC, alleging, inter alia, that the defendants breached the Settlement Agreement by failing to turn over rights to the Pierce Product.[6] More specifically, the Plaintiff argues that the Pierce Product constitutes an upgrade, update, modification, or new version of the Software Assets to which he was entitled. On June 4, 2001, following a three day trial, the Bankruptcy Court entered judgment in favor of the defendants.

---

[6]    The Plaintiff's complaint also alleged fraud, misrepresentation, judicial estoppel, and an additional breach of the Settlement Agreement relating to a networking software created by Amusement World, Inc. designed to make EDP an operational game. These counts have been dismissed, and the dismissal was affirmed on appeal. Horan, 2006 WL 859042, at *6.

5

The holding of the Bankruptcy Court was affirmed by the United States District Court for the District of Delaware, which reasoned:

> Pierce testified at trial that his software was a demonstration model and not operational. In addition, James Maid, president of GLI, testified that GLI performed tests on the device submitted by Pierce. The test results showed that Pierce's device was inoperable and that GLI "couldn't get it to first base." . . . Pierce's Elimination Draw Poker software, therefore, is not a new version of the Software Assets.

Reproduced Record, JAPP 0015-0016.

On appeal from the District Court, the Third Circuit Court of Appeals vacated the District Court's holding, noting:

> The District Court found that because the software was not operational, it was not a "new version" of the Software Assets. Therefore, it reasoned, there was no breach of the settlement agreement. However, the findings on this point beg the question whether something that is "inoperable" counts as an upgrade, update, modification, or new version if it is 99.9 percent complete and just needs to be "hook[ed] . . . up."
>
> We will, therefore, vacate and remand on this point so that the District Court, which may choose to remand to the Bankruptcy Court, may determine the facts relevant to the Pierce product. These facts include the product's effectiveness; its value to PVA, FEC, and Horan; and whether it can be considered an upgrade, etc.

Horan v. Danton (In re Prof'l Video Ass'n, Inc.), No. 05-1655, 2006 WL 859042, at *3 (3d Cir. Apr. 3, 2006).

6

Following remand from the Court of Appeals, this Court dismissed defendant PVA from the Proceeding in January 2007.[7] Contemporaneously therewith, the Plaintiff sought to reopen the record with respect to the issues on remand.  On January 18, 2007, the Court denied Plaintiff's request to reopen the record with respect to the threshold issue of whether the Pierce Product constitutes an upgrade, update, modification, or new version of the Software Assets, but requested briefing and citations to the already substantial record.  The Court held in abeyance the Plaintiff's request to reopen the record as to damages until it determines whether the Pierce Product is an upgrade, update, modification, or new version of the Software Assets.

The parties completed briefing on the threshold issue on April 17, 2007.  Oral argument was held on May 25, 2007, at which time the Court took the matter under advisement.

This matter is ripe for decision.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (O).

---

[7]    Debtor's Plan of Reorganization was confirmed in 1997 and fully consummated in 1998.

7

**DISCUSSION**

Pursuant to the remand instructions issued by the Third Circuit Court of Appeals, the Court must determine whether the "'inoperable'" Pierce Product "counts as an upgrade, update, modification, or new version if it is 99.9 percent complete and just needs to be 'hook[ed] . . . up.'" <u>Horan</u>, 2006 WL 859042, at *3.

I.    The Parties' Arguments

In support of its assertions that the Pierce Product constitutes an upgrade, update, modification, or new version, the Plaintiff relies entirely upon the testimony of Mr. Pierce. Mr. Pierce testified that, while he did not obtain EDP's original source code, he developed the Pierce Product by simply "looking" at EDP and writing the source code "from scratch". Reproduced Record, JAPP 0191, 0204-05. To create the Pierce Product, he copied EDP's rules but changed the font and upgraded the graphics. Reproduced Record, JAPP 0196. EDP's rules, the Plaintiff argues, are a component of the Software Assets. <u>See</u> Settlement Agreement at JAPP 0115 ("Horan invented a certain software program commercially known as 'Elimination Draw Poker'. . . . 'Elimination Draw Poker' together with the Patent, related copyrights, rules, design, format, system and related hardware (the Software Assets)"). Thus, the Plaintiff contends that the resulting software developed by Mr. Pierce, with its enhanced

8

graphics and new font, was an upgrade, update, modification, or new version of EDP, entitling the Plaintiff to certain rights pursuant to the Settlement Agreement.

In further support, the Plaintiff argues that the Pierce Product was, in fact, operational, but that the hardware created by FEC to allow the Pierce Product to be networked and played was insufficient. According to Mr. Pierce:

[Direct Examination]

A.    . . . And basically we had a fully functional version of the game [in September of 1999], but it was strictly PC-based. It wasn't hooked up to the - - it wasn't hooked up to the gaming equipment hardware.

. . .

Q.    Is the software complete?
A.    Yes. It is as complete as it can be until we had a machine put in front of us. I would say 99.9 percent. It's a matter of a couple of days of my programmer just hooking things up. . . . Our job was complete.

. . .

Q.    As of September 9th, you had a working version of this software?
A.    Demonstration version. And then - - when we went to GLI we had a finished version.

[Cross Examination]

Q.    . . . The software that you said was 99.9 percent complete when it was delivered to GLI means that it was not 100 percent complete. Correct? By definition.

9

A.  The hardware was nonfunctional.
Q.  No.  The software.
A.  We tested the software on a bank of computers.  So the networking software did work.  Everything worked within computer devices, but I mean, they [FEC] dropped the ball.

[Re-Direct Examination]

Q.  Mr. Pierce, Mr. Angstreich just asked you whether the software was complete.
A.  Uh-huh.
Q.  And you said it was 99 percent complete.
A.  Well, the software was complete.  It's basically like - - you go to the store and buy a program and it's not complete until you install it in your computer. It needs to be installed into a computer that's working.  If you hook it up to your old RCA TV set, it won't work.  If you hook it up to a functional Pentium computer, it runs.
Q.  It's an issue of hardware?
A.  Yes.

Reproduced Record, JAPP 0198-0209.  Mr. Pierce's testimony, the Plaintiff contends, indicates that the Pierce Product was operational when turned over to FEC for testing by GLI.  It was the poor quality of the hardware provided by FEC that rendered it inoperable.  According to the Plaintiff, if Danton and VLC (the "Defendants") had turned over the Pierce Product, he could have, pursuant to the Settlement Agreement, acquired or developed the proper hardware and distributed the game.

In opposition, the Defendants first contend that, because Mr. Pierce created the Pierce Product "from scratch", it could never be an upgrade, update, modification, or new version of EDP.

10

More specifically, the Defendants contend that without EDP's source code, patents, designs, and systems to analyze and alter, Mr. Pierce merely developed a new and different software game similar to EDP.

Second, the Defendants disagree with Plaintiff's assertions that the Pierce Product was, in fact, operable. In support, the Defendants highlight Mr. Pierce's testimony that the demonstration model completed in September 1999 was fifteen generations earlier than the Pierce Product which ultimately proved to be inoperable by GLI. Reproduced Record, JAPP 0206-07. Additionally, the Defendants argue that, despite the Plaintiff's contentions, the Pierce Product could not be operational until proper networking hardware was developed that would allow multiple players to play against each other through a central computer.

Finally, the Defendants argue that the inoperable Pierce Product could never be an upgrade, update, modification, or new version, despite that the fact that "it is 99.9 percent complete and just needs to be 'hook[ed] . . . up.'" Horan, 2006 WL 859042, at *3. In support, the Defendants point to the Settlement Agreement, which only grants the Plaintiff rights to distribute, demonstrate, or duplicate upgrades, updates, modifications, or new versions of the Software Assets. Because the Settlement Agreement does not permit the Plaintiff to

11

alter the upgrades, updates, modifications, or new versions of the Software Assets, the Defendants contend that they were not obligated to turn over the inoperable Pierce Product so that the Plaintiff could acquire the proper hardware and distribute the game.

II.  **Is the Pierce Product an Upgrade, Update, Modification, or New Version?**

At the outset it is important to note that the Plaintiff's argument regarding the operability of the Pierce Product is irrelevant to the issue currently before the Court.  In 2001, the District Court made a finding that the Pierce Product was inoperable.  This finding was not overruled by the Third Circuit Court of Appeals, and therefore, the Court will not revisit it. Today, the Court is called upon to decide the more refined question of whether the inoperable Pierce Product constitutes an upgrade, update, modification, or new version for purposes of the Settlement Agreement.  The Court concludes that it does not.

The parties represented to the Court at argument that the terms "upgrade", "update", "modification", and "new version" are not terms of art and do not have meanings peculiar to the software or gaming industries.  Therefore, to determine their meanings, the Court turns to the language of the Settlement Agreement, deemed unambiguous by the Bankruptcy Court,[8] as well

---

[8]    See Reproduced Record, JAPP 0133.

12

as to the common definitions of the terms.

It is clear that the Settlement Agreement is effectively a distribution agreement rather than a licensing agreement. Under the Settlement Agreement, the Plaintiff is entitled to:

> all exclusive distribution and all other related rights in and to the Software Assets, including any and all upgrades, updates, modifications, the name and/or new versions . . ., which rights includes [sic] the exclusive right to sell, advertise, distribute, demonstrate, manufacture and duplicate the Software Assets . . . . Horan's exclusive distribution rights arising out of the grant of rights to Horan by PVA of the Software Assets . . . not limited to: any proceeds of sales, advertising, sponsorship and/or manufacturing which arises or results from the sale, distribution, demonstration or duplication of the Software Assets by Horan . . . .

Reproduced Record, JAPP 0116. While the Plaintiff has argued that he could have developed hardware to make the Pierce Product operable, he was not entitled to do so under the Settlement Agreement. Rather, he was entitled only to distribution rights. Accordingly, if the Defendants had turned over the rights to the Pierce Product pursuant to the Settlement Agreement, the Plaintiff's only option would have been to distribute an inoperable product. This clearly conflicts with purpose of the Settlement Agreement and yields the conclusion that the Pierce Product, though "99.9 percent complete", was not an upgrade, update, modification, or new version of the Software Assets as those terms are used in the Settlement Agreement.

13

The common definitions of "upgrade", "update", "modification", and "new version" also lend support for the Court's conclusion that the Pierce Product should not have been turned over to the Plaintiff.

First, because the Pierce Product was inoperable, it could never be a upgrade. The term "upgrade" means "to raise to a higher level; to improve." XIX THE OXFORD ENGLISH DICTIONARY 293 (James A.H. Murray et al. eds., 2d ed. 1989). EDP was a fully developed and functioning computer software program, while the Pierce Product was inoperable and incomplete. Rather than improving or raising EDP to a higher level, Mr. Pierce developed a product which did not work.

Second, similar to an "upgrade", the Pierce Product is not an "update" of EDP. "Update" means "to bring (information, esp. written material or material recorded in some other form) up to date. . . . New information received or supplied; an updated version of something." Id. at 291. While Mr. Pierce testified that he designed the Pierce Product to have more enhanced graphics than EDP, the Pierce Product was, again, inoperable and incomplete. Thus, it never brought the operable EDP "up to date" and thus cannot be an "update".

Finally, because the Pierce Product was neither operable nor developed from EDP's original source code, it was a not a "modification" or "new version". Those terms are defined as:

14

Modification: "The action of making changes in an object without altering its essential nature or character . . . ." IX THE OXFORD ENGLISH DICTIONARY 951.

Version: "A special form or variant of something." XIX THE OXFORD ENGLISH DICTIONARY 559.

For the Plaintiff's purposes, the "essential nature" of EDP was that it worked so that he could distribute and presumably profit from it. The Pierce Product did not work and hence cannot constitute a "modification". Likewise, though it could be argued that the inoperable Pierce Product could fall under the definition of a new version of a "special form" of EDP, this result strains credulity in light of the stated purposes of the Settlement Agreement.

Moreover, the uncontroverted record reflects that Mr. Pierce did not receive the source code to EDP in order to develop the Pierce Product's rules, design, format, and system. Reproduced Record, JAPP 0196. Rather, he merely observed EDP in action and modeled the Pierce Product on it. This imitation of EDP can not be a "modification" because Mr. Pierce never had access to EDP's source code, which was the foundation for its rules, designs, format, and system. By this same logic, it could never be a "new version".

At bottom, the record reflects that the Pierce Product did not work. That it was 99.9 percent complete or one percent

15

complete makes no difference: under the Settlement Agreement, the Plaintiff could only utilize and distribute a functioning gaming system. EDP was such a working system; the Pierce Product was not operable, was therefore of no value or use to the Plaintiff in light of his limited rights under the Settlement Agreement, and thus was not an upgrade, update, modification, or new version of EDP.

## CONCLUSION

For the foregoing reasons, the Court concludes the Pierce Product does not constitute an upgrade, update, modification, or new version of the Software Assets. Therefore, the Defendants did not breach the Settlement Agreement by failing to turn over to the Plaintiff certain rights to the Pierce Product.

An appropriate Order follows.

BY THE COURT:

Dated: Wilmington, Delaware
      August 24, 2007

BRENDAN LINEHAN SHANNON
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PROFESSIONAL VIDEO | ) | Case No. 95-016 (BLS) |
| ASSOCIATES, INC. | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | Jointly Administered |
| ――――――――――――――――――― | ) | |
| | ) | |
| MICHAEL J. HORAN, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 98-247 |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM DANTON, PROFESSIONAL | ) | |
| VIDEO ASSOCIATION, INC., AND | ) | Related to Docket Nos. 177 |
| VIDEO LOTTERY CONSULTANTS, | ) | 178 & 179 |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |
| ――――――――――――――――――― | ) | |

## ORDER

AND NOW, this **24th** day of **AUGUST, 2007**, upon consideration of the Memorandum of Law filed by the plaintiff, Michael J. Horan, the response of the defendants, William Danton and Video Lottery Consultants, Inc. ("VLC"), thereto, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby FOUND, ADJUDGED, AND ORDERED as follows:

1.    The Pierce Product does not constitute an upgrade, update, modification, or new version of the Software Assets for the purposes of the Settlement Agreement.

2.    Defendants, William Danton and VLC, did not breach the

1

Settlement Agreement by failing to turn over the Pierce Product
to the Plaintiff.

BY THE COURT:

BRENDAN LINEHAN SHANNON
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | : | **CHAPTER 11** |
|  | : |  |
| **PROFESSIONAL VIDEO** | : |  |
| **ASSOCIATION, INC.** | : | **NO. 95-016 PJW** |
|  | : |  |
| **DEBTOR** | : |  |
|  | : |  |
| **MICHAEL J. HORAN** | : | **Adversary Proceeding No. A98-247** |
|  | : |  |
| **Plaintiff,** | : |  |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **WILLIAM DANTON,** | : |  |
| **PROFESSIONAL VIDEO** | : |  |
| **ASSOCIATION, INC., and VIDEO** | : |  |
| **LOTTERY CONSULTANTS, INC.,** | : |  |
|  | : |  |
| **Defendants.** | : |  |

Bankruptcy Court Room
Room No. 1 -- Sixth Floor
Marine Midland Plaza
824 Market Street Mall
Wilmington, Delaware

Thursday, January 11, 2007 @10:00 a.m.

Before:     The Honorable Brendan Linehan Shannon
            United States Bankruptcy Judge

Transcript of Proceedings

— Appendix 3 —

THE COURT:          Good morning gentlemen. We have two separate matters that are on for the court's consideration today. The first is the Motion to Dismiss filed by PVA and the second is the Motion to Re-open. I'd like to begin with the Motion to Dismiss. Mr. Reich.

MR. REICH:          Yes, Your Honor. May it please the Court, Your Honor, there are two aspects of the Motion to Dismiss. The Court of Appeals and its infinite wisdom, said that the software which was produced by Mr. Pierce was for Fortune Entertainment. The record clearly shows even the document, which was filed by the Plaintiffs shows that the software was produced by Pierce for Fortune Entertainment, not for PVA. How in the world anyone could say that this has any value? I don't even understand what the Court of Appeals said. How could Your Honor determine that is had any value to PVA, when PVA had no rights to it whatsoever?

THE COURT:          Mr. Reich, the PVA's plan is long confirmed. Right?

MR. REICH:          Confirmed and fully consummated back, I think in '97.

THE COURT:          What is the current status of PVA, does it still exist?

MR. REICH:          I would have to say that it still exists.

THE COURT:          Is it an operating company, does it have management?

MR. REICH:          No, no, it is not operating. It has….the real problem, and I'll go to another subject, Your Honor, the real problem, if Your Honor would re-open the case, which I don't think is necessary to do, because the Court has jurisdiction over the adversary action without re-opening the basic case. Someone would have to file the quarterly reports and pay the $250 and it's just a real problem. If Your Honor were to ….

THE COURT:          I think the question that is before me on the Motion to Re-open is re-opening the record from the trial, not opening the Chapter 11 case itself.

MR. REICH:          Your Honor, I won't speak to that because it would have no effect on me especially if you were to dismiss PVA from the case, which with due respect I think you are bound to do; because there is just nothing to decide. No matter how the Plaintiff twists and turns, the code says that with respect to revoking a confirmation order it has to be fraud.

THE COURT:          What do you think the Third Circuit meant, when they said, that we need to have further proceedings to determine the facts relevant to the Pierce product? These facts include the products effectiveness, its value to PVA, FEC and Horan, and whether it can be considered an upgrade etc. The Third Circuit clearly puts PVA into the mix.

MR. REICH:        Your Honor, I cannot understand that. I made it clear, I thought to the Third Circuit, that PVA had nothing to do with the Pierce software.

THE COURT:        Mr. Reich is it your position that if there is a question as to its value to PVA that your position is that it has no value.

MR. PEICH:        It can't possibly have any value, and with respect to the dedication of the confirmation Order of Court. Every judge who has dealt with it has determined that there was no fraud. Again, with due respect Your Honor, is bound by the determination of the Court of Appeals that there was no fraud, and since that is the only basis whatsoever, for revocation of a plan. The plan remains the plan has been fully consummated.

THE COURT:        Have all the distributions been made?

MR. PEICH:        All distributions have been made. Again, there is just no basis for one revocation for the plan. Any claim against PVA and again, although its beyond the scope of re-opening the case. Thank you, Your Honor.

MR. TARASI:        May it please the Court, My name is Lou Tarasi and I represent Mr. Horan.

THE COURT:        Good morning.

MR. TARASI:        Good morning, Your Honor. As you noted Judge, at page 7 of the Opinion of the Third Circuit, it quite clearly states, that this is remanded to your Court, to determine the facts relevant to the Pierce product, the facts include the products effectiveness, its value to PVA. Now one of the things we have Judge, is PVA assigned this matter, this product to FEC, which is who Danton was involved in both these corporations, and he is the Defendant here, and then Pierce did this, what we consider to be clearly a new version, upgrade or checkup. Therefore, the question is what's PVA, what value did it have or is it when it is assigned? Now, there is no question that it is no longer functioning and so forth. But at the time of these proceedings and the facts involved, Mr. Horan was the owner of PVA originally. So the question is under the law, what was the value of this particular product, corporation which was its assets, to Mr. Horan which ......

THE COURT:        What we are talking about the only thing we are talking about here from the Third Circuit is **the Pierce Product, which** occurred after confirmation and after the settlement and it would seem that the focus is on FEC. Let me ask a little differently. I don't disagree, ....As I said to Mr. Reich, my marching orders from the Third Circuit are I need to determine the value of PVA to FEC, and Horan. What do you think its

value to PVA? We decide any question if we need any more of a record, what could it possibly have to do with PVA?

MR. TARASI:    Because Judge, if Mr. Horan is the president of PVA, he can testify the value to him as an owner. What was it that was given up by him to go through this settlement agreement? One of the things we have for sure....

THE COURT:    When he did the settlement agreement this product did not exist. So, I'm not......... I don't understand what it is that you need PVA in here for. I understand that the Third Circuit said I need to determine all this, but structurally or substantively what's the difference? Wouldn't I conduct the same hearing anyway, if I do that, if I go down that path?

MR. TARASI:    Judge, the question that the mandate from the Third Circuit to Your Honor was its value to PVA. To determine that don't we need to open the record to get come evidence. For Mr. Reich to say that is worthless, that's a statement. Now, frankly, I think the question will be; what was it worth to Mr. Horan when this all took place? Also, as Judge Walsh noted in one of the things we consider, what's the future value of this situation? So we have an assignment ................

THE COURT:    But isn't that all FEC and it's all question of the status of the Pierce product is and ...... Let me ask it another way. In the absence of being directed by the Third Circuit to consider its value to PVA, FEC, and Horan, would you care whether PVA were involved in litigation? I don't see what Mr. Reich.... Mr. Reich doesn't have a client, it doesn't sound like there is much of one. There seems like a post confirmation defunct corporate shell. That is what I see from the record.

MR. TARASI:    The question that I have, of coarse, is PVA assigns this particular product to FEC who actually had a public sale that                on this thing, for like 8 or 9 million dollars, so what's the value that PVA assigned to FEC. I think that's the question I have.

THE COURT:    No that's different. That is what it is. The question from the Third Circuit is what its value to PVA, I see that as its value today. I know what its value is, I think we can all agree to what its value is. Its value to PVA in the context of the assignment is what ever it got out of the assignment, and that's done, isn't it? Think we are getting to the........... I am trying to figure out what the substantive difference between keeping them in. It may be that because we have our mandate from the Third Circuit that we have to determine its value to PVA. It may be that you would need to take discovery of Mr. Reich's client. But I don't know that that means that they're a party to the litigation.

MR. TARASI:          One of the problems that I have Judge, if the Third Circuit says its value to PVA; doesn't that mean the owner of a particular product. Which was Mr. Horan has a right to testify to its fact. That's the law under 702 in Evidence and the comments. So I am concerned are we leaving out some piece of evidence that we might need. Because, Mr. Horan doesn't own FEC. And this was assigned to FEC and he owned it but he always owned his product, it was his patent. Your Honor, your questions raise a problem in my own mind, but I don't want to foreclose a situation where I have an element of value, which the Third Circuit says we should consider what was lost here by Mr. Horan.

THE COURT:          And I think what I am asking is, do I need to keep PVA in if indeed you need to prove that element, that is a factual determination that would be essentially non-party discovery.

MR. TARASI:          I leave that to your discretion. I think frankly that I do not wish to close that door.

THE COURT:          I understand that.

MR. TARASI:          You are telling me that if of coarse if we keep them in for evidentiary purposes that might be all right.

THE COURT:          The reason that I am asking is because I am asked by the Third Circuit to conduct further proceedings. But I am at a loss to determine what relief I could possibly grant for you against PVA. I understand that there may be information that you might want from PVA, but I don't see any prospect for affirmative relief. It would seem that the issue of whether there was fraud has been fully disposed of.

MR. TARASI:          Yes.

THE COURT:          So it doesn't seem to me that keeping them as a Defendant, is necessary especially if the fact that the jurisdiction of this Court remains unimpaired. I think that it does. I clearly have more than enough grounds for jurisdiction, irrespective of whether I do or don't dismiss out the Debtor. That's what I have been wrestling with. I look at the phrasing from the Third Circuit and I am just not exactly sure it is that they want me to do with this as relates to PVA.

MR. TARASI:          After conferring with my associate Your Honor, I think you're right. As long as we have the ability to prove damages as to PVA's value to Mr. Horan.

THE COURT:          Well we are not getting ahead of ourselves on the question of re-opening the record and all that, but that would seem to me to be at least

logically how that process would play out. In the absence of the ability of me to award affirmative relief against PVA, it doesn't seem appropriate that they remain in as a party of the Defendant. Let's talk for a second if we can about the Motion to Re-open. I look at it ........... why don't you tell me what you want.

MR. TARASI:        Well Judge, the Third Circuit very clearly stated that they remand this matter for several reasons, which I can go through; they wanted to get more facts determined on the Pierce product, which were the products effectiveness, the value to PVA which is why I made my argument as long as we can get that in, the value to FEC, the Fortune Entertainment Corporation, the value to Horan, and then could it be considered an upgrade etc., all the new versions and everything else. And furthermore, you might consider is the value in the present day with the subsequent development not only in all over the country but especially in Pennsylvania where casinos and everything else are now used and so forth.

THE COURT:        In using this technology ..............

MR. TARASI:        You could, you could. That's the thing, you could. It's really not a gambling device it's a gaming. It's held by the Federal Court in Pittsburgh. The question is, what could be used for and what is the potential for this particular product? That's something that we could establish through evidence. Those are the things that we are concerned about opening the record for. To comply with the direction of the Third Circuit.

THE COURT:        Well it looks to me from your papers that the last point is really what we need additional evidence on. I think as to whether the product was an upgrade and whether it was effective, I know that on pages 2 and 3 of your papers your position is that there was sufficient testimony and evidence at the trial.

MR. TARASI:        There is sufficient but if you get the records open we'll put additional evidence in to show that is true.

THE COURT:        But, your point about the value, is one that your concern is that there not sufficient evidence, and that's what you want the record open for.

MR. TARASI:        Yes, certainly, as you put it Your Honor, the last point and Judge Walsh noted that, that is what is the future, damages to this situation.

THE COURT:        Let's take a step away, I don't want to presume anything one way or the other, but obviously I'm new to this case, I have not handled the

Chapter 11 case or the Adversary case. One of the question that crossed my mind, and if you are not prepared to answer it, I am not going to hold you to it, feel free to say that I want to think about or I don't know the answer. One of the questions that I look at is that I see software that was originally developed in 1985, and software that is at a minimum, with the Pierce product is 7 or 8 years old. The question I have is on a broader scale than the Third Circuit question of its value to one party or the other, what are we talking about here? How much value is at stake? Does anybody know, or is it being used by other parties, where there is a revenue string or an income string that you could say that should be ours? I am trying to figure out what at the end of the day, I know what the game is I am trying to figure out what the handle is.

MR. TARASI:        You see Judge, there is evidence in the record number 1 as far as damages and value are concerned, number one he gave up a judgment note of 1.2 million that's one thing.

THE COURT:        That's different though. The question I have is we're arguing about the product etc. and I am trying to figure out where it is you talked about the desire to introduce evidence, I am just trying to get a more global sense. I realize that this isn't evidence, this is argument. I am trying to get a larger sense…

MR. TARASI:        Well we are going through the whole history of this. Number one; it is an upgrade and so forth, I think is clear from the record. What was its value then certainly to the FEC, What was its value to Mr. Horan at that time? What was the fact that he testified that he had to spend 5.6 million dollars to get this thing in shape with the new version so forth, and he was denied that, and he could have got someone from manufacturing to testify to do it free of charge to him as long as he had the new upgrade version, that time period. The question now is for testimony from him or from another expert is what would this particular thing be as you put it Judge, at this time? After years down the road, what would it be at this time? You have several time periods involved as to damages. That's why it might be very important to open the record. Certainly it would show what the value be, the future damages, which were cut off by what happened to Mr. Horan when this thing took place. When they breached their contract. It was the whole theory of this agreement was the he progressively get upgrades, updates, new versions so he could be current and work with this product in all the estates he was assigned, one of which was Pennsylvania, which right now would be a bonanza for him because of all the casinos that are opening up. So these things are the things that we could establish through damages and its different periods of time but certainly with his idea from the beginning was to get all the upgrades, new versions, etc., so he could be current and continue to progress and make money with

particular patent of his. Which is now just about expired. Thank you Judge.

MR. ANGSTREICH:         Your Honor, with due respect to the Third Circuit and Judge Becker, may he rest in peace, the first question is, from my review of the record, whether or not Judge McCullough determined from the evidence before him that the Pierce product was or was not an upgrade or modification. If it was not an upgrade or modification, that ends all the inquiry. You can't discuss value to anybody because we had no obligation. Nobody had an obligation to give Mr. Horan anything unless it was in fact an upgrade or modification of the PVA software.

THE COURT:             Right, the Third Circuit says that the District Court's conclusion, I guess the Bankruptcy Court's conclusion, made the question of whether that something operable or inoperable is actually an upgrade or a new version.

MR. ANGSTREICH:         Well, let's go back to what the record is, the record, and it was their burden. They had an obligation to prove whether it was or was not. Now, if Mr. Horan put his evidence in through Mr. Pierce and, I forgot the gentleman from GLI, and that's what he tried to show as a modification, the question is, is the record sufficient before you to determine that. I don't think you get another chance, in other words, if the record is insufficient for you to conclude that it is a modification or an upgrade, they lose.

THE COURT:      Then they haven't carried the burden.

MR. ANGSTREICH:         They haven't carried the burden. You don't get an opportunity and I don't think the Third Circuit said, we're going to give you another opportunity to put more evidence in as to whether it is or it isn't. The fact that something isn't operational the fact that nobody ever proceeded with it, and in fact the evidence is very clear, they had an opportunity to establish the fact that nobody proceeded with the Pierce software. It ended, it died, it lay there, it never went forward.

THE COURT:             Here is what I am wrestling with, I understand that point, and I understand it as the movement for the Plaintiff they have an evidentiary verdict. But the Third Circuit had the full record before them, and remanded. They could have said, they could have looked at it, they complained about how long and complicated and tortured the record is, so they clearly went through it, and then they looked at it and said we are going to remand for further proceedings. They didn't say there is no evidence supporting this allegation accordingly to dismiss. They made that determination as to fraud. So they clearly didn't carry the burden on

fraud. So how is that consistent, how can I simply say, I don't need any more facts or record to close?

MR. ANGSTREICH:          I think what they said was that the Court did not directly determine, and I don't think that there was finding that the Pierce product was not an upgrade or a modification, and I think that's what the Third Circuit said. The Third Circuit said you didn't consider it, you didn't rule on it, you didn't make any finding of fact on it. Now, I don't think that the Third Circuit has the power, although I guess it could *sues ponte*, **said look** at the record and conclude that it isn't. But they choose not to do that and they sent it back and said somebody lest should look at the record and determine it and if they want to make whatever argument they want to make as to why it is they can do that. But for the Third Circuit to say somebody should get a chance to reopen the record to prove value to somebody, which would have been their burden, to establish whether it is or isn't a modification, I don't believe that the Third Circuit said that they get a chance to retry their case. They had that chance, if that's an element to establish a modification or an upgrade, and quite frankly I don't know how it is, but let's assume that it is, you don't get a chance, unless they say that Judge McCullough foreclosed them from putting the evidence in, and it doesn't say that.

THE COURT:          I keep coming back to the instructions on page 7.

MR. ANGSTREICH:          I do that too, Your Honor, and I am at a loss to understand how it could be that a Plaintiff who puts on his entire case, after many, many years and many, many hearings, is then told well you can get another chance because the record isn't clear as to whether or not there was a value to FEC or Horan or Pierce or PVA.

THE COURT:          Your position is that I don't need to re-open the record, that there is sufficient record as to the question to of upgrade and effectiveness.

MR. ANGSTREICH:          That's correct.

THE COURT:          And that if you prevail on that then you don't get the questions of value because you don't get the damages until you prevail.

MR. ANGSTREICH:          You can breach a contract. In other words let us assume for the moment that the Pierce software had a value to FEC, because clearly it couldn't have had a value to PVA. PVA didn't exist in the stream of events at that moment.

THE COURT:          Right.

MR. ANGSTREICH:        I couldn't have had a value to Mr. Horan per say unless it qualifies under the contract. So the question is, did it have a value to FEC? Well, whether it did or didn't does not make it a modification or an upgrade of the PVA software. So, that's the first question. The second point is and Mr. Tarasi said it again and he keeps saying it, but the record is against him. There is no obligation on the part of Mr. Danton, VLC, PVA to make modifications or upgrades to the software. In other words, if they took the Holeniker product which is what really ran the PVA software game, and they never modified it, and they never asked for a modification, and they never upgraded and the never did anything, and the entire industry passed them by, they didn't breach their contract, because they had no obligation on the Third Circuit so found in our favor because that was an argument. So we don't have an obligation and never had an obligation to continually re-tool. We also have a very interesting situation and that is that there was Holenicker software. He did have an opportunity and a right to take it and use it and get the machines, the Courts also said we had no obligation to give them a turnkey operation. All he had a right to do was to market what ever he wanted to buy. So again over the last seven or eight years he's done nothing with that which existed. So if you talk about what could he have done with Pierce, well, you got to take snapshot just like a balance sheet, you take a picture on the day of the trial. You don't go ten years later. He couldn't have projected value ten years later in the trial. What was the value? He put on evidence or attempted to put on evidence of what his damages were then. End of story. So you that the premise was this because we can't breach the contract, was this an upgrade or a modification?

THE COURT:        What if I find if it was?

MR. ANGSTREICH:        If it was a modification, then we had a right to have it turned over to him. That's the extent of what he would have had a right to because he put on his case, he said I had a right to **the modification** and he attempted to prove his damages. His damaged failed.

THE COURT:        But the Third Circuit sent it back to me on exactly that question.

MR. ANGSTREICH:        If you can find it in the record, then it is still their burden. In other words, the Third Circuit didn't say Mr. Horan gets another chance to prove damages.

THE COURT:        It said a remanding.

MR. ANGSTREICH:        For you to consider it.

THE COURT:                It may determine the facts relevant to the Pierce product, these facts include, the products effectiveness, the value to PVA, FEC and Horan, and whether it should be considered an upgrade. We have all ready agreed that record is sufficient on effectiveness and upgrade.

MR. ANGSTREICH:                For the record is sufficient for you to determine whether or not they proved that it had value. I do not believe that the Third Circuit said that the record gets to give him another opportunity..... The only way that the Third Circuit could open the record to allow additional testimony on damages is if they found that somehow Mr. Horan was precluded by error of Judge McCulluogh in proving his damages. You can consider whether or not the record has any evidence as to what Mr. Horan would have done with the Pierce product. Remember that is a very interesting aspect of it because he knew at the time of the trial that it didn't work. And so he didn't put on any evidence as to how much money he had available to him to make it work, what he would have done with it, that was his burden. So in other words, what the Court is saying, I think, first determine is it an upgrade or a modification. If it is, if you find that it is a modification, you can then determine what the damages were, and the damages are; What was its value to PVA? Look in the record, there is nothing, What was the value to FEC? They never put on any evidence as to the value to FEC. What was the value to Mr. Horan? He tried to prove that he would have made $2 million or something if he had been given the Holenicker software, if we had given him the machine.

THE COURT:                He not entitled to that.

MR. ANGSTREICH:                He not entitled to that. So for the Third Circuit to allow him to try his case again without finding that somehow he was denied a fair trial in putting on his damages, I don't think the mandate goes that far. The mandate says, you can take a look in the record if he failed to present the evidence that's his problem. He doesn't get another chance at it. The first question is, Was it an upgrade or a modification? And I think that by definition, and I tried to argue this before the Third Circuit, by definition something that doesn't work, something that doesn't meet the standards that GLI required and something by the evidence that they had the opportunity to put on was never proceeded with, can't be by definition an upgrade. By definition an upgrade means something that is better.

THE COURT:                Actually, you raised an interesting question, because is it relevant to me when you say it was never proceeded with, there is nothing in the record that says it was or wasn't proceeded with or that as of today in that the Pierce product isn't being used all over the world.

MR. ANGSTREICH:                Again, that would have been, they had an opportunity, because, if the Court recalls the Pierce work and the software was all

ready closed before the trial closed. The evidence that was presented was that nobody proceeded with it. Now they had a right if they wanted to attempt to put on evidence that somebody was going forward with it, Mr. Danton was in the Courtroom, they had an opportunity, in fact, they insisted that they had an opportunity to question him. I asked for an author of proof because he was on the witness stand, and basically they didn't want to ask the question about what is VLC or FEC doing with the Pierce software, they had that opportunity, they choose not to do it. So if the record does not reflect, and by the way, not to do their papers today, in other words, if the argument were, as they would like to argue, there either some missing evidence, that's not one of the pieces of missing evidence, or two the interest of justice required because there's been certain changes in the world, if they had come in with some certifications or some documentation that showed that in fact the Pierce software was being used by FEC, somewhere, somehow, and somehow we snookered them, during this trial and Mr. Pierce who was their witness, really wasn't telling the truth, I could see that they could make the argument in the interest of justice they should have that opportunity. They didn't offer that, they haven't offered that in their papers today, there's no certification, there's no verification, there's no documentation that says that we are doing anything today differently other than saying, gee if I had had Pierce I couldn't have taken that incomplete and ineffective according to GLI piece of software, I could have given it to somebody else. They could have then done something to it, but he had that opportunity, didn't he? Didn't he have the opportunity to bring people in in the first trial to explain what he would have done with Pierce. He had that chance. The statement that Mr. Tarasi made that he had somebody who was going to loan him $5.6 million, that man never showed up. That was testimony that was attempted to be offered, it was hearsay testimony, it was unsupported testimony, and in fact one of the questions that really existed was if you had somebody that was going to give you all that money, why didn't you buy the Holenicker machine and put them in your ten states? If in fact you had all of this credit worthiness and all this backing, why didn't you do what you could have done, but he didn't want that because he didn't have the money he wanted us to give him 34 machines, I think it was, or some number, so that he could go market them and have a turnkey operation. So again, we get to the question, what should the record be opened to do? What were they denied an opportunity to present? The answer is nothing. The Third Circuit doesn't say that the Trial Court committed error in precluding the Plaintiff from a fair trial. What the Court says is we don't think that the Trial Judge focused on the Pierce product in an appropriate fashion in order to determine whether or not the failure to turnover the Pierce product constituted a breach of contract and there was in fact no finding of fact. We tried to suggest in the record that Judge McCullough made such a finding. Third Circuit said he didn't. Unfortunately, it now turns to you. So that means that you look at the record. What the Plaintiff

is asking you to do is to say we should open the record and there is criteria for opening the record, the interest of justice, or a point not presented. Those are the only two basis for opening it, and in the interest of justice don't cry out for it, they don't meet the criteria, and the evidence that was not presented, they never offered you that either. So you got to look at the transcript and you got to look at the record and make a determination. If it not a modification or an upgrade, then destroy. If it is a modification or upgrade, did they prove damages, because they didn't get it. This wasn't a bifurcated trial. So the next question is, and if one of the measures of damage is the value to PVA, look in the record and see if they proved that. Look in the record to see if they proved the value to FEC, and look in the record to show how did Mr. Horan attempt to prove his damages from the denial of getting the Pierce product? And that's as far as I believe the mandate went. The mandate didn't say open the record and give them an opportunity to try their case again because Judge McCullough somehow denied them a fair trial. Thank You.

THE COURT:         Thank you.

MR. TARASI:        Your Honor if I may respond to that.

THE COURT:         Sure.

MR. TARASI:        The fact of the matter is that the mandate from the Third Circuit is quite clear. Judge Becker noted according to Pierce, that it would take only a couple days, Pierce stated, "that demonstration version of the software had been completed and the everything worked." And Mr. Pierce testified that the 16 versions of this thing he went through to bring it so its working level that he had. Those are **all**         **one** of the things we get. And beside that, one of the upgrades we are entitled to is software. And what they did, the record shows, whenever they got the software which worked they had hardware which didn't work and they didn't provide it. So that's why it shutdown. One of the things that the Third Circuit said to us and to you, Your Honor, what's its value to FEC? Now we know as a fact, after the FEC had an initial public offering of $8 to 9 million, the only thing that they had was what Pierce created.

THE COURT:         When did that occur? Did that occur before the trial?

MR. TARASI:        I'm not sure, Judge.

THE COURT:         The issue I think as you heard from Mr. Angstreich is the record... the point is that the record is closed. You were at trial, you had the opportunity, if it's in there, if there is evidence or testimony then you should be restricted to pointing me to that.

MR. TARASI:     If I have the Third Circuit saying you find out what its value is to FEC, that's actually something a little bit different than I had it before when I was trying the case. What's the value to FEC of this particular product?

THE COURT:     Isn't that part of your damages?

MR. TARASI:     It may well have been Judge, but at that time I don't know if we had that particular information. But the fact is Judge, if the Third Circuit says that we can actually prove that particular item, I would like to have the chance. Because it was a point not presented to handle that situation.

THE COURT:     Well let's circle back to where we started. As I see it the Third Circuit told me to follow-up on three things, products effectiveness, the status of whether it's an upgrade, and then its value. Do you agree that if I determine that this is not, or that it was ineffective or it didn't qualify as an upgrade, that the question of its value is one of damages that becomes moot.

MR. TARASI:     That's correct.

THE COURT:     If indeed I find that because it was 99.5%, 99.9% complete or that the completion would only take a couple of days or that 16 versions, you get versions, that indeed there was something there that you should have gotten, then Mr. Angstreich's point is that you are limited to the record. Your point is that I should be able to prove that. I should be able to develop or produce additional evidence or testimony that would quantify that value because it was something you should have gotten and didn't get it.

MR. TARASI:     One of the things I have is what Judge Walsh noted, Your Honor, what about the present future damages, which we couldn't get into and didn't. And Judge....

THE COURT:     Why didn't you?

MR. TARASI:     One of the things we didn't have that the casinos being legal in Pennsylvania at that time.

THE COURT:     The thing was that if you had won, and Judge Walsh said its value is $1 million, then you get a million dollars. And now we are six years later the trial closed five years ago, do you get that? I don't know that your right to expand that dramatically because you prevailed on a remand. Do I look at those five years or do I look at it as snapshot of what it would have been worth at the time? Do I recon........ do I hold another trial ?

MR. TARASI:        No. Not another Judge, but if just to bring the points that the Third Circuit said, if you remand it for that purpose, why can't I put that in evidence?  Another thing Judge, this evidentiary record contrary to Mr. Angstreich said, Mr. Horan testified that if they had given him the software upgrade and so forth as required of new versions, he could have had any manufacture provide the                                    machines and everything at no cost to him, and he so testified.  Then he said that because they didn't he have to spend 5.6 million getting machines from Holenicker to make this thing out and use the states he was supposed to take care of.  That's 5.6 million that's in the record.  He also testified as an owner ......

THE COURT:        Why would I need additional testimony?  Why wouldn't I look at this and say that to follow Mr. Angstreich point, and really at least two thirds of the way with yours.  I have enough of a record from the testimony and I will ask guidance from the party to get through the record and briefing on that issue, to determine whether it's an upgrade or not, and then you should tell me where in the record I could quantify damages if indeed you prevail.  Why would I need to take additional testimony on that point?

MR. TARASI:        Your Honor, the only reason I would say that be done is to clarify clearly, what the Third said, was this an update?  I think that the record shows it already that if you need additional testimony to establish that fine.

THE COURT:        But this is an interesting question, because you have ........ we are in agreement that it's been remanded to me for three things, and you agree that the record below is sufficient, for the record here is sufficient to close the loop on two of them.  Why isn't it enough on all three?  I'm not saying that you win or lose.  To be candid I have not been all the way through the record and the transcript, etc., so I don't know what the evidence or testimony as to damages, profits or loss profit, etc., is or would have been.  I think I need to understand why......

MR. TARASI:        Your Honor, I think in the one point the FEC point on the value to it, it was not explored as it should have been because we got a mandate now specifically to that issue.  And I think that that's and issue of damages which is not presented clearly in our case because actually we were not at that point.  But now we are at the Third Circuit saying it.  I think at the very least I should have the record open to put in what the value was to FEC.  Because what the Court said in the Third Circuit was this matter with PVA and FEC where Danton was involved in both of them there was an assignment PVA to FEC.  And if PVA is out of the case, what's the value of what they assigned?  And one of the things I 'd like to establish in damages is what it was to FEC, at the very least.

MR. ANGSTREICH:        First the FEC public offering occurred before the trial. In fact the FEC document was an exhibit. They had the opportunity if they wanted to, to how through that document whether or not the Pierce product was the basis for the public offering. I guess they could have done that. The Third Circuit didn't say to you, we believe that the Plaintiff's attorneys didn't try the case appropriately. They didn't focus in on the value to FEC and therefore you should on the remand give them an opportunity to open the record. They couldn't do that unless they found that somehow they tried to put that evidence in and the Trial Judge precluded it and that was error. But that's not one of the claims of error that was advanced before the Third Circuit. So we are limited to the four corners of the record unless the interest of justice require and opening of it or there is some new evidence that somehow or some point that was overlooked based on equitable remedies and equitable issues. But it is still their burden to bring that forward. So I think that the focus is as Your Honor, just articulated it, look at the record, the Plaintiff wants to point out where the evidence is to support it, you then have to do what the Third Circuit said, make a finding was Pierce a product that required, was required to be turned over, because it constituted what ever it was an upgrade or modification, etc., and if the answer is yes, then the question is just point me to what the damages are that Mr. Horan presented as a result his not getting Pierce. Not, not getting something else, but not getting Pierce. They can't make a leap to damages from the fact that they didn't get the machines from Holenicker or they didn't get the Holenicker versions, all of the other arguments that they attempted to get the damages from. Let them point to the record where Mr. Horan testified or they offer evidence that said, How I had Pierce, I would of done X,Y, and Z, had the capabilities of doing X,Y, and Z, and then with that would have made the gazillion dollars that he claims to have made today. And it would be interesting, if in fact, it were legal in all ten of the states we went to trial to use these machines and today it is not legal. I don't think they would be arguing that they would have no right to go forward to prove their damages based upon the state of events at the time we went to trial. So I think that goes to the question, I guess it is very similar to a divorce proceeding and issues of equitable distribution, what's the value? It's today's value, it was that value then. Thank you.

MR. KENNY:        Your Honor, may I address the Court?

THE COURT:        Certainly.

MR. KENNY:        Thank you, Your Honor. Bill Kenny for the Plaintiff, Mr. Horan. I think, Your Honor, hit the crux of this argument when you asked, Wasn't the question of its value, that is the Pierce product's value to PVA, Horan, and FEC and Danton a part of our measure of damages? It was not. It was not an element of our damages what the value of the Pierce product is

to FEC.  It is not a measure of our damages what the value is to Mr. Danton.  It is what the value was to Mr. Horan.  That's of record.  Those remaining issues were not part of our burden of proof.  And that is what I tried to get across to the Court in our papers.

THE COURT:    Then why does the Circuit tell me to look into it?

MR. KENNY:    Why didn't they find that 38 machines were **modified Mr. Danton** to the also new versions?  I don't know.  I don't have an answer to that question.

THE COURT:    And we're wrestling with that question of the mandate, because they ......  I've wrestled with the question of how and you heard **my with** Mr. Reich.  How this would be, how its value to PVA is neither here or there, but this is what we get.

MR. KENNY:    This is the mandate.  I agree, Your Honor.  The record in this case is fit and there have been many years that have passed needlessly, quite frankly, since the trial.  On the issue of whether this is an upgrade, update, new version, on the issue of the products effectiveness, its effectiveness, I mean that's an ambiguous term in and of its self, effective in what sense.  Is it effective, can it be utilized, is it effective, is it marketable, is it effective in what sense.  The question in our case on a breach of contract action as it relates to the Pierce product, is could he use it?  Not whether it was approved by a regulatory agency.  Could he use it, under the terms of the agreement, which gave him the right to manufacture and duplicate any and all new versions.  That's the question.  That's the contract.  It's an unambiguous contract.  As to the measure of damages, I don't care what its value was to FEC.  I don't care what its value is to Danton.  Its what its value is to my client as his measure of damages.  That's established in the record.  But those remaining issues are not and the Third Circuit is, send it down to Your Honor with this mandate.

THE COURT:    Well let's follow through on that.  So you've established, you made your case as to what it was worth, what your damages are for purposes for Horan.  What possible value then could I, leave aside that the Third Circuit told me to do it, what possible value could the exercising of determining its value to FEC and PVA, what's the upside?

MR. TARASI:    Well I'm going to answer that one.  Because of the mandate on FEC from the Third Circuit, that would be the reason at the point of justice to open the record as to that.

THE COURT:    What do I accomplish?  Suppose that we do that and I determine either by re-opening the record and you say that Mr. Horan lost $5.6 million, and I hold a further hearing that I determine that FEC made $20

million off of this, your damages are what ever they are. I am at a loss at to............. I think Mr. Kenny's right. I don't care or you don't care what value is to PVA or FEC. Rather what the value is to your client and that's your damages claim. Mr. Angstreich agrees that your, you had a chance to put your damages claim on and what I am wrestling with I'm just not sure what, if I conduct the hearing and open the record, and take evidence on its value to FEC and PVA if need be. What would I ever do with that number? What does that do?

MR. TARASI:    Here's the situation Judge, if PVA assigns it to FEC and if FEC, which isn't done, and they have a initial public offering, what's it worth to FEC? And that's what I think the Third Circuit tells us.

THE COURT:    And that's part of your measure of damages?

MR. TARASI:    Yes, that's a point, in the interest of justice why can't we get that particular number in as to what they offered to the public and this was their product. This is what they're talking about, the PVA product. That was it and it belong to Mr. Horan. Isn't that a measurer of damages?

THE COURT:    No, not necessarily. I mean don't you have to prove that this would have been your damages versus whatever value they obtain from it, they were allowed to use it as well. You just didn't get it, you lost it a business opportunity, and presumably you had the opportunity to put in evidence and you tell me you did, about Mr. Horan's losses as a result or his lost opportunity. But how does that tie into FEC? And I think that the beating that we are all taking is the phrasing of the mandate.

THE TARASI:    But you see Judge, the mandate is what its value to FEC, what is it? The value of FEC is obviously when they make a public offering certainly its value to FEC. If it is that value to FEC and it was assigned by PVA, which was Mr. Horan's product to them, isn't that an indication of in the interest of justice of damages to Mr. Horan. It's a patented product. And if he turns around and says and they do this, that the basis of what they offered for this publicly, why isn't that a measure of damages to him when they stopped him from producing with the new software, a new version, he could have had the public offering himself then. But they stopped it because they frankly from what the record indicates, Mr. Pierce completed like the Third Circuit said, 99.9%, and he actually testified that the software was complete. But they didn't give him the hardware to make it work. Certainly after they made their money from the public offering, they didn't care.

MR. ANGSTREICH:    We are not talking about the same case again. PVA assigned the software assets to FEC that it had, that Mr. Horan had a right to. Pierce came along after that. PVA had no dealings with Mr. Pierce.

FEC had dealings, Fortune Entertainment had dealings with Mr. Pierce. So I don't know why the Third Circuit said what it said. I can't answer that question. We can't ask Judge Becker, unfortunately, what he meant by that. But what we do know is that the Third Circuit found that the Trial Court did not commit error in precluding the Plaintiff from having an opportunity to present something. What we also know is that potentially if the Pierce product had a value to FEC, that could be an indication that it was a viable product. They had a public offering document they presented it, it was in the record, and really, that's where it goes. The Third Circuit could have said, open the record for evidence on these issues. It said go and look in the record, consider these issues in order to determine whether or not the Plaintiff did or did not prove breach of contract and damages. That's what it said, and here's our guidelines, this is what you can look at in order to determine whether or not the findings which support the Plaintiff, or the findings which support the Defendants, and I think we're just arguing about the whether or not the Third Circuit gave you the green light to open the record regardless of whether there were error in the trial as presented. And I don't think the Court gave you that green light.

THE COURT:        I think I've had it. As to the Motion to Dismiss, I will grant the motion. As we discussed, I am at a loss to identify any affirmative relief that I can grant to the Plaintiffs from PVA. The Pierce product its self, that is the subject of these hearings, was created after the assignment, the record is clear and the docket is clear, and I will take judicial notice of the docket that the Debtor's plan was confirmed long ago. All indications are that is substantially consummated and counsel representations are that all distributions have been made. So I see no value or benefit to keeping PVA in as a party. I note that we are directed by the Third Circuit to determine its value to PVA, FEC, and Horan. If indeed the remaining parties of the litigation wish to development that record, PVA can be called up as witness. But I see no benefit and no need for them to remain as a party to the litigation. There was a question earlier about whether the Chapter 11 case would be re-opened, I don't see that as a request from the Plaintiffs. I see again no benefit that would be served by re-opening the Chapter 11 case is a practical matter. I agree with counsel that re-opening that case creates more administrative difficulties than it could ever solve or aid. **So I will grant the Motion to Dismiss.**

As to the Motion to Re-open the Record, as a threshold matter I will direct that the parties submit briefings on the two issues that the parties are in agreement that the record from the trial is sufficient. I want briefing on the question of whether it is an upgrade and its effectiveness. As I said, and as I think the parties have agreed, the record in this case is long. I have not been all the way through the trial transcript and I will look for guidance and assistance from the parties, both as to what the evidentiary record was below, but also on the substantive question of what

is an upgrade or a modification. And I will not take additional evidence or testimony from any party in that regard. On the question of its value to PVA, FEC and Horan, I will hold in advance that issue. I recognize that the trial below was not bifurcated, but I think that given what we have been directed by the Third Circuit, I think that it makes the most sense. My initial inclination, as I said, I'm holding that in advance, but for the benefit of the parties I appreciate the submissions and the arguments, it's been very, very helpful to me today. My initial inclination is that I would permit a limited opening of the record, because I have been directed by the Third Circuit to consider its value to PVA, FEC, and Horan. We may question why the Third Circuit wants me to do that, but I do thing that the record may benefit from additional submissions, but I don't want to cross that bridge right now, and to be honest, while want to put everybody through a groundhog day experience. We may if I find that it is indeed an upgrade or that it was effective, we may have this hearing again to determine the extent to which the record should be opened. But I think that due to judicial economy and the interest of the parties would benefit from dealing first with that legal and factual issue that the parties agree that the record is sufficient on before we start talking about what sort of discovery, whether post-trial developments should be considered in that. So my order will direct that the parties submit briefing on those two issues. The question of discovery and the question of its value will be held in advance pending the Court's disposition of the question of the upgrade, effectiveness. I agreed and I think that both counsel agreed that if the Court finds that it is not an upgrade or was not effective, then the question of its value becomes moot.

Mr. Angstreich.

MR. ANGSTREICH:          Can I ask for one clarification? The issue of effectiveness is outside the four corners of the contract. In other words, if Mr. Smith developed a new video poker game, a very effective video poker game, the question wasn't and the contract didn't require, that any effective software anywhere in the world we had to buy, we had to get, we had to turn it over. So the question is it in the disjunctive or in the conjunctive, must it had been effective and an upgrade or modification or is Your Honor basically saying that Mr. Pierce could have had effective software and even though it were not a modification or an upgrade of the PVA software Mr. Horan was entitled to it.

THE COURT:          Let me clarify that. The Third Circuit used the word effectiveness I have not actually gone back, I did look at the assignment in the documents when I originally got this. They used the word effectiveness. I don't recall whether that is part of the list. I don't view the Third Circuit's decision as expanding the contractual rights of Mr. Horan. If indeed, this was something, the Pierce product was something that Mr. Horan was entitled to under the agreement then that's the question. Not whether it's

effective and I don't believe that the Third Circuit intended to include or to change the language. As I read it, I think it included that all rights in the software assets including any and all upgrades, updates, modifications, the name and or new versions, and I see that as the issue before the Court. The question of effectiveness, I appreciate the clarification, it's the Third Circuit's word, but what I think the question is, what were his rights under the contract, what would he have been entitled to, and what I will look for from the parties is briefing that will get me through the record, identify for me the specific areas of the transcript and related submissions, and briefing on the question of whether or not this would or should have constituted an upgrade such that Mr. Horan would have been entitled to it.

MR. TARASI:    Your Honor.

THE COURT:    Yes Sir.

MR. TARASI:    Upgrade, etc.

THE COURT:    I saw the etc.

MR. KENNY:    I don't know if Mr. Angstreich was asking this or not but when I look at the word effective, it could mean several things. Effective in the context of the arguments being made by the Defendants, they say it is not operational. Do they mean effective in that sense? And if it assumed within, is the issue of whether it is effective assumed within the larger broader issue of what's defined under the contract, my client's entitled to. Or are we talking about and evaluation thing again.

THE COURT:    No. I think I am satisfied that the question of whether it was a product was something to which Mr. Horan was entitled to under the terms of the contract. I think that the parties agree that the contract itself was unambiguous. The interjection by the Third Circuit of the word effectiveness, I don't think changes to legal analysis of what ever he is entitled to. I think that it was helpful that we don't head off in a direction to try and figure out what the effectiveness means, we will deal with the other words as well. Mr. Reich.

MR. REICH:    I have one question Your Honor.

THE COURT:    Yes Sir.

MR. REICH:    My recollection of what was said appears that the Plaintiff does in fact agree that there can be no claim against PVA, and that the confirmation cannot be overturned. In order to make sure that I'm never before this Court again, could we consider it a consent or an order.

MR. TARASI:          The ruled in your favor.

MR. REICH:          I don't know that because there are other aspects of the case whether it is a currently an appeal able final order.

THE COURT:          The Motion to Dismiss or the Order?

MR. REICH:          The Order. Therefore, I would have to wait to tell who ever I tell about what the status of the case is until Your Honor rules and had a Final Order with respect to the whole case. Therefore, if it were to be a consent order, PVA would be out of it with no additional rights to appeal.

THE COURT:          Well let me this observation. Like I said, in ruling I do not see any affirmative relief that I can grant against PVA in favor of Mr. Horan. Given the facts and given the legal position of the plan the entry of the confirmation order and the dispositive ruling by the Third Circuit that there was no fraud. If you want to take the opportunity to discuss with Mr. Tarasi whether you can come to terms on a form of a consent order, I would invite you to do that. If you can agree, you can submit it under certification. Absent that, I will honor an order that simply dismisses PVA from this Adversary Proceeding.

MR. REICH:          Thank you.

THE COURT:          I will look for guidance from the parties on that. As we talk about the briefing and scheduling, my preference in the matter is to at least start with the parties and give you an opportunity to come up with timing and schedule. If you can't reach agreement, then I am happy to be available at your convenience. I'll dispose of this as you wish. I think that I probably will require argument on it. And I apologize to the parties that I do need that given the extent of the record. But I need some guidance on this. I would expect and you should expect that I will take argument from the parties on that threshold question noted, upgrade and diversion etc.   So if you wish we can take a break or you can consult your calendars at a later point and get back to me with a briefing schedule. I am at the party's disposal.

MR. ANGSTREICH:          Are you contemplating simultaneous briefing or would it be up to the Plaintiff to submit a brief in support its position to which can respond and then they reply.

THE COURT:          I would see that the Plaintiff would actually file the opening and I would....my experience with simultaneous briefing has been less than ideal. I often find that people head in different directions. So it would be helpful to me that we would as we have done with this, I would see an opening, a response, and a reply.

MR. ANGSTREICH:        I would thing by Friday that we could have the order. We can work that out, and I don't think that there will be any difficulty.

THE COURT:        The other suggestion that I would make to the parties and I am not going to order it, but I would certainly prefer it, if you can agree on a submission of the record, binders or something that you would work together on and basically both jointly refer to.  I think, one it will save both of you on paper, because I assume that you will be making similar submissions, and second it will be just a lot easier for me to work from that as well.  So what I will look for then is, Mr. Reich, I will look for a motion... an order dismissing that either is a consent order or has been reviewed by the parties and submitted under.....

MR. REICH:        I'll speak to Mr. Tarasi probably tomorrow and certainly within the week.  Be able to say ....................

THE COURT:        I'll look for a scheduling order that sets forth what the parties agree to and again if you can't reach agreement then simply get me on the phone.

MR. KENNY:        Would you prefer that filed or a letter to the Court?

THE COURT:        I would prefer it filed under certification and then what we will do is we will enter that order and the parties will abide by it.  Gentlemen, it there anything further?

ALL:        No. Thank you Your Honor.

CERTIFICATE OF SERVICE

I, C. William Kenny, Esquire, do hereby certify that the foregoing Appellant's Opening

Brief was served upon the following by U.S. First Class Mail, postage prepaid, on the 18th day

of February, 2008.

Steven E. Angstriech, Esquire
Levy Angstriech, Finney, Baldante,
    Rubenstien, & Coren, P.C.
1616 Walnut Street
Philadelphia, PA  19106


TARASI & TARASI, P.C.


By                      
    C. William Kenny, Esquire
    Attorneys for Plaintiff

    510 Third Avenue
    Pittsburgh, PA  15219
    Phone # 412-391-7135
    Fax #: 412-471-2673
    E-Mail: cwk@tarasilaw.com